**GOOD HOLDING CO. et al. v. BOSWELL.**
No. 12369.

United States Court of Appeals
Fifth Circuit.

March 8, 1949.

Rehearing Denied April 19, 1949.

SIBLEY, Circuit Judge, dissenting.

———◆———

E. F. P. Brigham and Thomas C. Britton, both of Miami, Fla., and B. K. Roberts, of Tallahassee, Fla., for appellants.

Herbert S. Shapiro, of Miami Beach, Fla., and Siegfried Geismar, of Cincinnati, Ohio, for appellee.

Before SIBLEY, HOLMES and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Frances B. Boswell brought this action against The Good Holding Company, a Florida corporation, Carolyn Good Tucker and Owen Tucker, wherein damages were sought for an alleged malicious prosecution.

The complaint avers that the defendant corporation, acting through its president, Carolyn Tucker, and its agent and servant, Owen Tucker, together with the defendants, Carolyn and Owen Tucker, acting individually, maliciously and without probable cause instituted plaintiff's arrest and criminal prosecution on a charge of embezzlement, which charge was subsequently dismissed, after plaintiff had thereby suffered damages to her reputation, health, and ability to obtain employment.

Defendants, in answer, admitted the arrest and dismissal of the charges, but (1) denied causing the arrest; (2) denied that the charges against plaintiff were filed maliciously and without probable cause; (3) disputed the agency of Owen Tucker for The Good Holding Company and for Carolyn Good Tucker; and (4) alleged that the information and warrant for plaintiff's arrest were filed by the county solicitor of Dade County, Florida, upon independent investigation, and the prosecution was therefore an act of the State of Florida, and was in no way caused by defendants.

The case was tried to a jury, which returned a verdict for plaintiff in the amount of $7,000. A motion by defendants for a new trial was thereafter overruled.

The material facts upon which decision must turn, carefully deduced from a painstaking review of the voluminous record evidence, disclose the following:

In the year 1946, The Good Holding Company owned the Good Hotel, located at Miami Beach, Florida, in which it operated a cocktail lounge and bar, known as "The Music Box Club". Carolyn Good Tucker was the majority stockholder, president, and treasurer of the Company, and with the assistance of a manager, she operated the Hotel and cocktail lounge. In the latter part of January, 1946, upon his release from the Army, Carolyn Tucker placed her husband of a few months, Owen Tucker, in direct management and control of the lounge and bar.[1] Almost from the time he

---

1 Although Owen Tucker testified that he was not in the employ of his wife or The Good Holding Company, and received no salary for his services, his own testi-

was placed in charge, Tucker, who had never had any previous experience in such work, was convinced that there was "something wrong in the cocktail lounge". A fluctuation in the cost of liquor sales, as revealed by the hotel auditor's report, confirmed his suspicion that employee thefts of either the liquor stock, or money received for liquor sold, were creating the discrepancies. He thereupon reinforced the locks on the liquor store room and display counters, and retained the keys himself. He personally checked every bottle of liquor received and withdrawn. When the losses and discrepancies from the operation of the lounge continued, Tucker began to suspect the cashier and other employees of pocketing money and receipts from sales, and fired a number of employees for that reason, or on that assumption.

In the course of replacing the employees discharged, plaintiff, having been recommended by an employment agency, was interviewed and employed by Tucker on March 18, 1946, as checker and cashier in the lounge. She was the fourth or fifth cashier to be hired by Tucker within a period of less than three months, and when she was accepted for the position, Tucker informed her, " * * * there was quite a bit of stealing going on in the cocktail lounge and that he intended to put a stop to it even if he had to throw everyone in jail in order to get the right one * * *." About this time, Tucker also remarked to a bartender, afterwards discharged, that "he trusted nobody"; that the "previous checker was being fired because he was sticking money right and left in his pocket"; and that "he would teach the people a lesson down here in Miami, and he would put them into jail if he had to put the whole town in jail". This bartender testified that Tucker was " * * * just mean, that's all. * * *"

As checker and cashier, it was plaintiff's responsibility to see that either cash or a signed check was received for each portion of the liquor stock sold. It was also her duty to balance the cash register account against the cash in the till every morning before leaving for home. She was on duty from 5:00 p. m. to 1:00 a. m. six nights per week, and while on duty was never supposed to leave her post, even being required to take her meals behind the cash register. There were two bartenders and two waiters employed in the cocktail lounge with her. At 1:00 a. m. every morning, when the lounge and bar were closed, plaintiff went over the day's receipts and cash on hand under Owen Tucker's supervision. Plaintiff testified that she always stayed after work with Tucker until she balanced her account, as shown by the register, with the cash on hand, even if it took an hour or more to do so. Tucker, however, testified that her account was never balanced but one time; that discrepancies and shortages were always revealed at the end of the working day. In any event, in spite of the innumerable "irregularities" which both Tucker and his wife claimed they saw plaintiff commit during this period, and in spite of her consistent shortages and failure to balance each day's receipts, it is without dispute that plaintiff was never fired, or once threatened with discharge. To the contrary, shortly after she was hired, Tucker employed a Miami detective agency to watch her, the bartenders, and the waiters in the bar and lounge apparently to confirm his suspicion that they were all stealing from the Company. The detective agency had previously advised Tucker that no accurate check on his employees could be made until he first replaced his old cash register in the lounge, an old food register, with a new register which would provide a visible record of the amount of each charge as that charge was made. Tucker there-

mony patently refutes his contention:
"Q. In whose employ were you? A. Well, that is a technical question. * * * when I got out of the Army about the twentieth of January my wife asked me to take over the cocktail lounge, * * * I had a lot of duties. * * * I worked about twenty hours and sometimes worked only eighteen but usually twenty hours a day. I had to get up and let the work-men in, in the morning at eight o'clock. * * * then I got dressed and acted as host. I would meet all the people and I could stay there and seat them and we had a little show for the people. I acted as Master of Ceremonies. I sang all the songs that the people wanted and I acted as one star. I filled all the orders of the bartenders. * * * I did all the hiring and firing * * *"

upon, on March 28th, installed a second-hand cash register which was supposed to record accurately all sales and receipts from the operation of the lounge, but there seems to be some question whether this register was working properly during the time plaintiff was employed.[2] With this used machine, it then became plaintiff's responsibility to effect an accurate daily balance between the tally of sales visibly recorded by the register, on the one hand, and the cash in the till plus the signed checks on whiskey orders charged to hotel guests, on the other.

On March 29, 1946, one day after the installation of the second-hand register, Tucker and his wife took a trip to Cuba. Before leaving, Tucker, together with two detectives from the agency, took an inventory of the liquor stock in the cocktail lounge. For the next three nights, while the Tuckers were gone, several detectives from the agency kept a constant watch over plaintiff, the waiters and bartenders, to determine if they were stealing either liquor or money from the Hotel. They observed the conduct of these employees and prepared written reports thereon, in which it was stated that plaintiff did not "know how to act in a respectable establishment, but persists in being 'rowdy', and thus giving the appearance of being cheap"; and further, that it was evident that "the checker, waiters, and possibly the bartender, are working together". In confirmation of the reports made, both Mr. and Mrs. Tucker and the detectives testified that on numerous occasions they had seen plaintiff register less cash than she received from a customer; ring up a lower charge than the normal price for liquor sold; and transfer money from the till to her purse.

On April 2, 1946, after the return of the Tuckers from Cuba, the detectives and Owen Tucker took another inventory of the liquor stock in the lounge. This second, or "comparison inventory", was later filed with the detective agency and delivered to the Tuckers and it purported to reveal a discrepancy of approximately $311.65 in liquor unaccounted for.[3] The written report prepared by two of the detectives, St. John and Canada, was also filed with the agency and thereafter submitted to the Tuckers.

Shortly after receiving the written report from the detective agency, both Mr. and Mrs. Tucker went to the county court house to confer with the County Solicitor of Dade County, Florida.[4] They showed the Solicitor copies of the inventories and report of the two detectives, but did not bring the original records or papers. Furthermore, they did not inform him that there had been "overages", as well as "shortages" while plaintiff had worked; did not total the alleged shortages against the admitted overages during the same period; did not report the fact that even when they, defendants, had acted as cashier in the lounge after plaintiff was arrested that the discrepancies and shortages had continued;[5] did not reveal that the cash register on which the inventories and re-

---

[2] Tucker testified that " * * * On March 27th I bought the machine * * * I could not get a brand new machine. * * * It was checked before it went into my place of business. I checked it myself. * * * they claim that the machine is not working properly, * * * *", and further:
"Q. It was not checked between March 29th and April 4, 1946; is that correct? A. Only by myself."

[3] Plaintiff offered this so-called "comparison inventory" in evidence, and much testimony in dispute of its accuracy. It was shown that liquor prices thereon were "plus or minus 10%", instead of being exact; that "figures were computed by figuring 25 ozs. (of liquor) in 4/5ths of a quart", although Archie St. John, one of the detectives who helped prepare the inventory testified that there were 26 ozs. in a "fifth", and later only 22 ozs., finally admitting he was "not sure" which estimate was correct. Apparently no allowance was made for wastage, and no overages in certain whiskeys were shown thereon.

[4] Both Tucker and his wife testified that they called at the Solicitor's office in response to a call from his secretary, and that they did not request plaintiff's prosecution.

[5] Mrs. Tucker's daughter, Catherine Leonard, had checked the cocktail lounge and bar while her mother and Owen Tucker were away on the trip to Cuba. However, she did not appear on behalf of defendants at the trial, and is supposed to have been on a fishing trip that day.

port were based was a second-hand or used machine, and that there had been complaints concerning its accuracy; and failed to disclose that the cocktail lounge and bar had been operated during the afternoons before plaintiff arrived for work by other employees, who also had access to the liquor stock, in order that they might be made subject to an independent investigation by the Solicitor. As a result of this consultation with the Tuckers, and after a subsequent interview with Owen Tucker and the two detectives, St. John and Canada, the County Solicitor drew up an information, and warrants of arrest were thereafter issued for every employee who worked in the lounge and bar, including the plaintiff. On the night of April 4, 1946, about 10:00 p. m., deputy sheriffs entered the cocktail lounge and arrested plaintiff,[6] two bartenders, and one of the waiters. A fourth employee named Burke, who was not present when the officers arrived, was arrested later. Plaintiff was locked in a cell in the county jail for the night with five other women, and was not released until the next afternoon about 4:00 p. m., when one of her former employers in Orlando, Florida, wired her money with which to secure a bondsman, and she was thereafter released on bail under a charge of embezzlement.

The criminal trial was held before the Criminal Court of Dade County on April 25, 1946, and it resulted in a dismissal of the charges and an acquittal of plaintiff and the other employees.[7] During the progress of the criminal trial, it was shown that Owen Tucker had remarked to his wife, within plaintiff's hearing, "Boy, we sure got the goods on them this time. Ten years for embezzlement is a long time", and that he afterwards "just smiled and just smirched or whatever you call it".

It is well settled that in an action to recover damages for malicious prosecution where, as here, the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury. Seaboard Oil Co. v. Cunningham, 5 Cir., 51 F.2d 321; Daniel v. Pappas, 8 Cir., 16 F.2d 880. Moreover, mere proof of issuance of the warrant and filing of the information by the county solicitor does not of itself negative the existence of malice, or conclusively establish probable cause, where the jury has found upon substantial evidence that defendants, in failing to make a full and fair disclosure of all the facts concerning the alleged crime, were themselves the motivating spirits responsible for instigating the criminal proceeding. Seabord Oil Co. v. Cunningham, 5 Cir., 51 F.2d 321; Hays v. Stine, 4 Cir., 289 F. 224; Stainer v. San Luis Valley Land & Mining Co., 8 Cir., 166 F. 220; Hornin v. Montgomery Ward & Co., 3 Cir., 120 F.2d 500.

There is abundant evidence from which the jury might reasonably have found that the testimony of both the Tuckers, and at least one of the detectives, measured only to evasion, inaccuracy, inconsistency, and contradiction. Although Tucker denied any agency whatever for his wife and The Good Holding Company, he nevertheless admitted working from eighteen to twenty hours a day for them without salary, and that he alone retained the keys to the cocktail lounge and liquor storeroom, and did all of the hiring and firing with his wife's consent and approval. Both Tuckers testified that they bore no malice or ill-will toward plaintiff, yet the record is replete with testimony of remarks made and action taken by them from which the jury could have inferred they acted maliciously and

---

[6] Both Tuckers testified that they did not know plaintiff was to be arrested, and there was evidence that shortly before plaintiff was seized, that Owen Tucker introduced a new bartender to her, with the request that she acquaint him with his duties, as "Murphy (bartender afterwards arrested) won't be with us any longer". However, the detective Canada, whose testimony was not nearly so contradictory and inconsistent as that of the witness, St. John, testified that the Tuckers were present when the Solicitor stated that all four of the employees in the bar, including plaintiff, would be arrested. In any event, when plaintiff was seized, Tucker was apparently not surprised, as he did not intervene or offer any explanation in her behalf.

[7] Although appellant insists plaintiff was acquitted on a technicality, the record of the criminal trial which is before us reveals that her case was heard fairly on its merits, and that the charges against her were dismissed because of a failure of proof.

vindictively in causing her prosecution. As for the detective, St. John, the evidence shows that he has reversed his testimony on at least three separate occasions since becoming involved in this case; first, in his sworn written report filed with the detective agency and later delivered to the Tuckers, as well as in his testimony before the Solicitor concerning the report made, he unequivocally stated under oath that plaintiff had on many occasions embezzled money from the lounge and bar; second, at plaintiff's criminal trial, however, St. John testified directly to the contrary:

By The Court:

"Q. Did you see any money passed. Was any money passed? A. No money has been passed.

"Q. All I am interested in is money."

\* \* \* \* \* \*

"A. I didn't see any money given to the checker."

\* \* \* \* \* \*

"Q. Is that all the State has got?"

"Mr. Wynn: Yes, sir."

\* \* \* \* \* \*

The Court: "All I am interested in is the money. They are charged with embezzling money. \* \* \* If you don't have any testimony as to that, there is no use in my sitting here listening to it. \* \* \* All right; I find them all not guilty, if that is the testimony. \* \* \*"

Finally, after the present suit was filed and at the trial below, St. John reverted to his former and original testimony that plaintiff and the other employees had on many occasions stolen money from the Hotel, thus practically repudiating his previous sworn testimony at her criminal trial. He attempted to excuse his threefold inconsistency on the ground that he had previously been "confused" by the court's questioning. Also, on cross-examination upon the trial of this suit, this witness revealed many discrepancies and inaccuracies in the inventory upon which his testimony before the Solicitor, and the ensuing prosecution of plaintiff and three other employees was largely based. It must be remembered that Owen Tucker hired the detectives, prepared the inven-

tories with them, and otherwise joined in their indiscretions. He supervised their activities and paid for their services, all with the consent and approval of his wife and the Good Holding Company, and the latter are therefore responsible for any unjust invasions against plaintiff's rights which he and the detectives were found to have committed. If the jury found that the inventories and report on which plaintiff's prosecution was based indulged in too much suspicion, and the charges contained therein were largely untrue, it was also open to them to find that Owen Tucker helped prepare them, and magnified and distorted the true facts in his accusations and charges before the Solicitor, and that he acted maliciously and without probable cause in so doing. We find no merit in the contention that merely because an insurance company saw fit to reimburse the Tuckers in the amount of $311.65, as a supposed loss from employee thefts in the cocktail lounge, that the jury could not reasonably have found want of probable cause for the prosecution of every employee in the lounge and bar. Such a view would completely ignore much of the evidence as to the inaccuracy of the inventories upon which plaintiff's prosecution was based, as well as that of the meager disclosures and unfounded accusations laid before the County Solicitor by both the Tuckers and the detectives. We conclude there is abundant evidence from which the jury might reasonably have found that defendants instigated the criminal prosecution of plaintiff, and that her arrest and prosecution was obtained by and through them maliciously, and without probable cause. Seaboard Oil Co. v. Cunningham, 5 Cir., 51 F.2d 321; Hornin v. Montgomery Ward & Co., 3 Cir., 120 F.2d 500; Cf. Brown v. Selfridge, 224 U.S. 189, 32 S. Ct. 444, 56 L.Ed. 727.

There was no error in the trial court's refusal to allow the report of the detectives, which was prepared for and solely at the request of defendants, to be introduced into evidence. It was an ex parte document filled with much incompetent matter, and in no wise constituted a part of the inventories, which were admitted. Moreover, the detectives who pre-

pared the report were before the court and jury and testified in person, and the reports could have been qualified and introduced through them, if desired. The trial court correctly ruled that the witnesses might resort to it to refresh their memory, but the report itself was not competent evidence, and was properly refused. Moreover, the witnesses, St. John and Canada, testified at length as to the substance of the reports, and the fact that the information contained therein had been presented to the County Solicitor. The introduction of these reports in evidence would have been merely cumulative, and under the circumstances it cannot be held that the refusal to admit them constituted prejudicial error. 3 Wigmore on Evidence, Sec. 2094, et seq.; cf. St. Louis and S. F. Railway Co. v. May, 53 Tex.Civ.App. 257, 115 S.W. 900.

We further find that the oral charge of the court, when fairly considered in its entirety, substantially preserved all material issues in the case for the consideration of the jury. In any event, although adequate opportunity was had to challenge the oral charge, no exceptions were taken, and the court may not now be put in error in this regard. On eight separate occasions in the course of the oral charge, the court explained to the jury that the plaintiff had the burden of proving malice and want of probable cause on the part of defendants in order to recover. The jury was further instructed that even if she proved these elements, if it was shown that defendants had made a full and complete disclosure of all the facts to counsel and independent action was taken thereupon, the defendants would still not be liable. As for the written charges requested and refused by the court, a careful consideration of each of them discloses that every relevant and legal charge requested was substantially covered in the court's oral charge. The issues were all properly submitted, and we find no prejudicial error in either the oral charges given, or the requested charges refused. Hornin v. Montgomery Ward & Co., 3 Cir., 120 F.2d 500; cf. Duval Jewelry Co. v. Smith, 102 Fla. 717, 136 So. 878, 880; Seaboard Oil Co. v. Cunningham, 5 Cir., 51 F.2d 321; cf. Ward v. Allen, 152 Fla. 82, 11 So.2d 193.

The jury heard all of the evidence adduced throughout four days of trial, and it alone was afforded the opportunity to observe the demeanor and conduct of the witnesses and parties, and to pass upon their credibility. We are not empowered to invade its province to find the facts, merely because the evidence is in dispute, or because reasonable men might draw different inferences and conclusions from all the testimony. Seaboard Oil Co. v. Cunningham, 5 Cir., 51 F.2d 321; Daniel v. Pappas, 8 Cir., 16 F.2d 880.

After a fair and impartial trial, original counsel for defendants were permitted to withdraw from the case, and defendants thereafter sought to obtain a new trial by filing affidavits casting grave reflection on plaintiff's character, and manifestly designed to impeach her testimony as to the damages sustained. We are invited to accept these sordid disclosures, dredged up from the police records of Miami at least two years after plaintiff's arrest and prosecution, as evidence against plaintiff's good character as shown at the time of this trial. Such evidence is manifestly incompetent and inadmissible. Brown v. Schwartz, 5 Cir., 164 F.2d 151; Cf. Spurr v. United States, 6 Cir., 87 F. 701. It is much more reasonable to indulge the belief that after it was found these defendants had stripped plaintiff of her good reputation and ability to seek and obtain her customary employment, that she afterwards went down life's roadway to degradation and ruin.

There appearing no reversible error in the record, the judgment is accordingly

Affirmed.

SIBLEY, Circuit Judge (dissenting).

While I think the majority opinion overstates the plaintiff's case and understates that of the defendants, the verdict might be upheld but for errors in presenting the case to the jury. These errors are: (1) The refusal to submit the question whether any of the defendants did in fact institute a prosecution of the plaintiff. (2) The instruction that if one defendant was guilty all were, though the only evidence of malice is as to Tucker. (3) A wrong definition

of malice was given. (4) The charge on the measures of damages was wrong and in view of the size of the verdict the error should be noticed without special objection made.

As to the objections to the charge the record shows that oral and written requests were made by each side. Among other requests defendants' counsel said: "We would like for you to instruct the jury to the effect that if Mr. and Mrs. Tucker did not know that this particular lady was going to be arrested upon the information that was communicated to them by these detectives, that under those circumstances they could not be held liable for her arrest. They testified they expected her to stay on, that they introduced her to the new man the same day she was arrested." The Court said: "I deny that charge and will deal with it in a charge of my own. * * Let the record show that exceptions are allowed to each counsel for each party to my refusal to give the charges requested and an exception is allowed to each to the charges I give on my own account." No further objection was needed to the points thus brought to the court's attention and ruled upon.

(1) The answer flatly denied that the defendants had prosecuted the plaintiff. She had the burden of showing the defendants had initiated the criminal proceeding against her, as the very first step in her case. 3 Restatement, Torts, § 672(1). Ward v. Allen, 152 Fla. 82, 11 So.2d 193; Duval Jewelry Co. v. Smith, 102 Fla. 717, 136 So. 878; Fisher v. Payne, 93 Fla. 1085, 113 So. 378. She sought to prove it by calling Tucker as a witness. He testified, as Mrs. Tucker afterwards did, that neither of them instructed the prosecution and neither had at any time requested that the plaintiff be prosecuted, that they had no ill will to her and expected her to continue at work. Tucker testified that on the detectives' report that $311 in liquor or money was short for the three or four days it covered, a claim was made on an insurance company, which paid the claim, and he believed the insurance company had put the matter before the Solicitor. Both Mr. and Mrs. Tucker testified that they were requested by the Solicitor's secretary to come to his office, and they and the detectives were questioned by him but they did not know who he was going to prosecute or for what offense. The Solicitor made the accusation and issued the warrants and caused the arrests afterwards, without their participation. Tucker discharged two of the men, but did not discharge or threaten to discharge the plaintiff, as she herself testifies, but a few minutes before she was arrested he introduced her to a new man whom he had hired, and asked her to instruct him and "break him in." She testifies also that the Tuckers had not manifested any ill will to her, and Tucker had, when she was employed about two weeks before, warned her that stealing was going on. She testifies she heard Tucker say at the criminal trial to his wife, "We sure have got the goods on them this time. Ten years for embezzlement is a long time," but it was said in her presence, and very probably was said about the men, who had been suspected long before she was employed. The Solicitor, who could have best told who directed the prosecution, did not testify. The men were probably guilty of stealing liquor or its proceeds. They do not sue here. They were acquitted because the proof offered related only to missing liquors, and not to $311 in money which the accusation alleged was embezzled. The Solicitor appears to me to have made two errors, one in failing to make his accusation relate to the liquors, and the other in accusing this plaintiff at all. I think the defendants' motion for an instructed verdict on the ground that the evidence shows they did not institute the prosecution may have been properly denied, though that is a close question. I see no reason to doubt that it should have been submitted to the jury.

What the court did was to tell the jury this: "The question that you have in analyzing this testimony is not whether the defendants brought about this prosecution, instituted it, but whether they in good faith made a full, fair and complete disclosure of all the facts to the prosecuting attorney, and when you sift the case down that is what you gentlemen are going to have to decide on this testimony." Nowhere was the issue submitted whether all

or any of the defendants requested or intended a prosecution of the plaintiff as distinguished from the bartenders and waiters. There was no duty to make full disclosure as to her if they did not intend to prosecute her. This charge deprived the defendants of their best defense.

(2) The judge also told the jury this: "Three defendants are named in this case, Good Holding Company, the owner of the hotel property, Carolyn Good Tucker, the principal stockholder of that Company, and Owen Tucker her husband. Gentlemen, Owen Tucker and Carolyn Good Tucker were acting as agents for the Good Holding Company in the operation of that hotel and anything that they did in connection with the business of the hotel was done as agents of the hotel and the hotel would be liable for their acts. The law also makes the agent personally liable in cases of this character." Tucker was the actor in this matter, and all the sayings relied on to show malice are his sayings alone. Though having no formal employment by Good Holding Company and no salary, he was in fact the manager of the Cocktail Lounge of the hotel. He had authority to hire and fire employees there, and it was his duty to stop stealing there. It seems that in Florida at least such an agent has no authority to institute for the corporation a criminal prosecution for acts already done. In Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 217, we read: "There is a marked distinction between a false imprisonment or arrest caused by an agent for the purpose of protecting property, or recovering it back, and an arrest or imprisonment caused for the purpose of punishing an offender for an act already done. Ordinarily, there is no implied authority in a servant having the custody of property, to take such steps as he thinks fit to punish a person who he erroneously supposes has committed a crime against the property, and the trend of decision is against holding the master liable when the arrest has been made after the supposed crime has been committed, and not for the protection of his property or interests." S. H. Kress and Co. v. Powell, 132 Fla. 471, 180 So. 757, is not applicable to Tucker. If it is, the corporation was at least entitled to have an issue as to whether Tucker was trying to protect the liquors in his charge which he could have done simply by firing the dishonest employees, or whether he was seeking to prosecute for past acts to punish them; and the even narrower question of what he was seeking to do in reference to the plaintiff herself. The charge given was plainly wrong.

(3) Requests were also made as to the charge on malice. The charge given as to which exception was allowed as above stated was this: "In cases of this character malice does not have a technical meaning of a personal hatred or dislike of the individual prosecuted. It may mean that the persons bringing about the prosecution were prompted by motives they consider advantageous to them in causing the prosecution to be brought about. Where a person believes that a crime has been committed by some one in his employ but is without knowledge as to which of the group committed the crime and brings about a prosecution of the entire group in an effort to punish the one guilty, he would be guilty of malicious prosecution of those innocent of the offense." The first quoted sentence makes some advantage to the instigator of the prosecution a sufficient test of malice. Apparently the court had in mind an action for abuse of legal process, which this is not. If the test of malice in a suit for malicious prosecution be that stated, all prosecutions to stop stealing would be malicious. As applied to Tucker as the corporate agent, he could act for the corporation in prosecuting only to protect the property in his charge, but under this instruction that very motive would make any unsuccessful prosecution malicious. I think that is not the law.

The second sentence, as to the individual defendants, could be interpreted to mean that a prosecution in wanton disregard of the rights of the innocent could be malicious, and is close to the question of total want of probable cause which may show malice; but the only evidence of such a purpose here is some precedent expressions of Owen Tucker, unknown to his wife or the corporation. The instruction might apply to him individually, but it was wrong in a charge which had refused any consider-

ation of whether the defendants had sought at all to include the plaintiff in the prosecution, and had given the jury the instruction in effect that if Tucker was liable all were liable.

(4) The verdict of $7,000 appears to be excessive. This in itself is not the responsibility of a federal appellate court. But the court should consider the more carefully errors in the trial which may have caused it. The plaintiff testified to no monetary loss. She spent one night in jail, but testifies that it was clean and the deputy sheriffs treated her very nicely. She gave bond the next morning and went to the hotel where the Tuckers paid her her full wages. She obtained other employment at once, but quit it voluntarily because she feared she might be embarrassed by Tucker, who however she says never did or said anything to that end. She was tried and publicly vindicated twenty-one days after her arrest. She got other employments. She testifies that she lost no employment since "as the result of her employers discussing this incident." After some weeks she went home to another State where she married, having been theretofore divorced. She came back with her husband to Miami to live. After the trial of this case on a motion for new trial for newly discovered evidence it was shown by the court records in Miami that she was on Feb. 21, 1948, convicted under the name of Rustine Evans of running a bawdy house and sentenced to serve fifteen days in jail and pay a fine of $250. On March 21, 1948, her place was again raided and both she and her husband were arrested and convicted on the same charge and each sentenced to serve fifteen days in jail and to pay a fine of $250. This newly discovered evidence of ex post facto occurrences was not ground for a new trial. But I can't help thinking that if serving fifteen days in jail did not deter plaintiff for two weeks even from joining her husband in repeating the same offense, $7,000 for one night in the same jail is too much for these defendants to pay. The eloquent conclusion of the majority opinion that the plaintiff went bad because she had been stripped by defendants of her good reputation and ability to obtain her customary employment is chivalrous, but wholly imaginative under this record.

Although no objection was made to the charge on the measure of damages, it was a fundamental error that left the jury without any guide. It was: "The amount of damages is a matter for you gentlemen to determine, an amount that you business men are authorized to determine in your judgment, of course not to exceed the amount claimed in the complaint in this case." There was no explanation of the kinds of damages, especially general damages to vindicate a right, and punitive damages to prevent a repetition of the wrong or punish actual malice. There was no warning to be fair and just to all parties in the exercise of a fair discretion. The jury were told to award any amount they might determine not in excess of the amount sued for.

I think the trial was not according to law in the points above discussed, and a new trial is due to justice.

Rehearing denied; SIBLEY, Circuit Judge, dissenting.