George T. NISHIDA and James E. Nishida, d/b/a Hilo Dairy Company of Kauai; Ryoju Sokei, d/b/a Sokei Dairy, and Fred L. Waldron, Limited, Appellants,

v.

E. I. DU PONT DE NEMOURS & COMPANY, Appellee.

No. 16140.

United States Court of Appeals Fifth Circuit.

June 20, 1957.

Rehearing Denied Aug. 16, 1957.

Roger E. Brooks, Washington, D. C., Wm. G. Burgin, Jr., Columbus, Miss., Pratt, Tavares & Cassidy, Kashiwa & Kashiwa, Honolulu, Hawaii, for appellants.

Earl T. Thomas, Jackson, Miss., Carl E. Geuther, Wilmington, Del., W. C. Wells, III, Jackson, Miss., Wells, Thomas & Wells, Jackson, Miss., of counsel, for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

L. L. Ford had for some years been in the field of processing soybean oil and soybean meal by an oil extraction process, using a solvent known as hexane which is derived from petroleum. In 1950 Ford and others began the construction of a mill for the extraction of oil from soybeans. The appellee, E. I. du Pont de Nemours & Company, had developed and marketed a chemical solvent for processing soybeans known as trichloroethylene. This product was known to the trade as "tri" and our consideration for typists, typesetters and proofreaders induces us to refer to it, wherever we can, by its three-letter designation. The du Pont Company was referred to Ford by Iowa State College. Du Pont stressed the advantages of tri as a solvent, it being non-volatile and of extremely high recovery. Ford and his associates were furnished with technical information and advice by du Pont during the planning and building of the mill. While the mill was under construction Ford and his associates formed a corporation under the name of Magnolia Soy Products Company. The corporation took over the mill. The mill was completed and the production of soybean meal was commenced in March of 1951, using tri as a solvent for the extraction of oil from soybeans. The soybean meal was sold for cattle feed.

The use of tri in the processing of soybean meal was not new, and the harmful effect of tri-extracted meal had occasionally been suspected. In 1916 a report known as the Stockman Report discussed the death of cattle in Scotland after being fed tri-extracted soybean meal. Stockman concluded that tri itself in comparatively large doses was not poisonous to cattle but that in the process of extracting the oil from soybean a poisonous substance was formed and he recommended that this method be discontinued. In the 1930's experiments at Cornell University were financed by du Pont and conducted by Dr. Vollersten to determine the effect of tri-extracted soybean meal upon cattle. He concluded that the tri process, properly operated, did not produce a dangerous product. In Iowa and Colorado there was an outbreak of a hemorrhagic cattle disease similar to those described in the Stockman report and in the report of Dr. Vollersten on the Cornell experiment. In August of 1950, which was before the mill of Magnolia had been constructed, Ford had a discussion with T. J. Milligan of du Pont in which Ford expressed his concern about reports he had received as to the toxicity of soybean meal extracted with tri. Ford quoted Milligan as saying there was nothing to the rumors. Ford requested a letter of assurance. Milligan wrote and in his letter referred to a "smear campaign" which he said was maligning the quality of tri-extracted soybean meal. With the letter was an appendix. In this paper du Pont mentioned the then recent attacks of hemorrhagic cattle disease in Iowa and Colorado and related the investigations which had been made to ascertain the cause. In this appendix du Pont stated that soybean processors, veterinarians, and university veterinary faculties with whom du Pont had discussed the cases had concluded that soybean meal was probably not the cause. Also included with the letter of August 11, 1950, was a mimeographed paper captioned "Trichloroethylene Soybean Extraction". In this paper it was stated that du Pont "with its faith in the process was actively promoting its use". There it was also said, "In considering this process, we also respectfully suggest that a company with the national prominence and reputation of 'du Pont' can scarcely risk recommending a process such as trichloroethylene extraction unless we are absolutely convinced as to the quality and marketability of the product that it will produce and the cost at which it will operate".

In January of 1951 there was an outbreak of the hemorrhagic disease in Minnesota from which a number of cows and calves fed on tri-processed soybean meal died. R. Stuart Armstrong, a Solvents Technical Representative in the employ of du Pont, went to the University of Minnesota in May or June and arranged

for it to conduct research into the cause of the disease with du Pont financing the program. The report of the University of Minnesota investigation was published in October of 1951 and read by Armstrong during the following month. It showed that one of two calves fed tri-extracted soybean meal died. This report was not communicated by du Pont to Magnolia.

On July 31, 1951, C. B. Shepherd, Manager of the Chlorine Products Division of du Pont, wrote to Magnolia stating that there were increasing indications that tri-extracted soybean meal might be associated with a hemorrhagic disease in cattle which had been observed in widely scattered areas. It was said that despite satisfactory experiments in the past, the possibility could not be ignored that the meal might be associated with the disease. The final paragraph of the letter said:

"In view of the present uncertainty, we strongly recommend that sales of trichloroethylene-extracted meal be confined to outlets other than cattle feed until more definite information is available from the investigations now underway in Minnesota and Iowa. To the best of our knowledge, the hemorrhagic disease in question is peculiar to cattle only, and all available evidence and experience indicates that trichloroethylene-extracted meal is entirely satisfactory as a component for feeding hogs and poultry".

This letter was delivered on August 1, 1951, by Armstrong to Ford and Reed of the Magnolia Company. There is a wide divergence between the testimony of Ford and the testimony of Armstrong as to what was said at the time of the delivery of the letter. Ford testified that he told Armstrong "here you've let us spend $500,000 building this mill and now you tell us we can't use it to manufacture feed." Ford quoted Armstrong as replying "the reason I brought it [the letter] personally was because I didn't want you to get excited about it." Ford's testimony continued, "I asked him 'does

the du Pont Company know we can't operate our mill and have built one here that cost $500,000? If we can't sell it for cattle feed we can't operate it. Did du Pont tell us to shut it down? Do they have evidence?' and he said 'No, there isn't any evidence conclusive, there's rumors circulated from time to time'." Ford quoted Armstrong as saying also that so far as he knew there wasn't any evidence that tri-extracted meal had anything to do with cattle losses. Ford said he asked Armstrong point blank if du Pont would recommend the closing down of the plant because meal couldn't be sold for cow feed and gave Armstrong's reply as negative. Armstrong testified that he delivered letters such as the one quoted to all known users of tri in soybean extraction, there being four such mills besides Magnolia. Armstrong denied making the statements attributed to him by Ford. Armstrong's testimony was that a discussion was had of the possibility of operating the mill for the production of meal for swine and poultry feeds.

In October 1951, a weekly periodical, "Feedstuffs," published for those in the business of producing and marketing feeds, reported that the Association of American Feed Control Officials had adopted a resolution discouraging the use of tri-extracted soybean meal as feed for cattle and calves until it had been proved that these products were nontoxic for such animals and that such products should be labeled with a warning prohibiting the use of such meal for cattle feed. Armstrong testified that Reed, an officer of Magnolia, had admitted seeing the publication. Subsequent to these events, Magnolia ordered and du Pont supplied it with further shipments of tri.

Fred Waldron, Ltd., a dealer in animal feeds in Honolulu, Hawaii, ordered 200 tons of soybean meal from The Brode Corporation, of Memphis, Tennessee, which in turn ordered the meal from Magnolia. The order was filled by it. The appellants Nishida operated a dairy in Hawaii as did the appellant Sokei. These dairymen purchased from Waldron

soybean meal made by Magnolia, fed it to their cattle and many of the cattle died and others became violently ill. Waldron sold meal to other cattle owners who fed it to their cattle with similar results. The Nishidas and Sokei brought suits in the court in Hawaii against Waldron for their losses and the other cattle owners who had sustained losses asserted claims against Waldron. The Nishidas, Sokei, and Waldron each brought an action in the District Court for the Northern District of Mississippi against du Pont for the losses and damage claimed to have been sustained as a result of the feeding of the soybean meal. Each complaint was in three counts; count one asserted breach of an implied warranty that soybean meal manufactured by the tri process would be fit and wholesome feed for cattle; count two set up a breach of an implied warranty to all purchasers that soybean meal so manufactured would be of merchantable quality; and count four (count three being eliminated) being based on negligence. The cases were consolidated for trial.

At the close of the evidence and after motions for directed verdicts for the defendant had been made and denied, the court gave its charge to the jury. The court instructed the jury that du Pont had collaborated with those who had built the Magnolia mill and represented to them that tri-processed soybean meal was a safe product for the feeding of cattle; that after such representations Magnolia manufactured meal which was ultimately fed by the Nishidas, by Sokei and others to cattle and as a result of such feeding cattle died and no reasonable man could come to any other conclusion; and that, though the chemical reaction had not been ascertained, the feeding of tri-extracted soybean meal does kill cattle. The court told the jury that the case was to be determined by what the jury thought of the factual situation with respect to the letter written by Dr. Shepherd and delivered by Mr. Armstrong to Magnolia early in August, 1951. After mentioning that the jury would recall what the letter said, the court said, "That, by the defendant is alleged to have broken the chain of causation from the legal standpoint in this case. If it did not break the chain of causation from the legal standpoint in this case, I think your verdict would bound to be for the plaintiffs in this case. If it did break the chain of causation then your verdict should be for the defendant in this case". If, said the court, the actions of the defendant were not such as would have caused a reasonably prudent man to desist in the selling of tri-processed soybean meal for cattle feed, or were such that it knew or should have known that Magnolia would continue to sell such meal for cattle feed without regarding such sales as extraordinary, then the jury should find for the plaintiffs. The court pointed out to the jury the conflicts between the testimony of Ford and that of Armstrong. Instructions were given as to the burden of proof and upon damages. At the conclusion of the court's charge an objection was made by one of the attorneys for the defendant to a portion of the court's instructions, and the objection was overruled. Counsel for the plaintiffs then stated, "For the record, Your Honor, may we most respectfully raise the question of law by excepting to the court's ruling, ruling out possible prospective profits?" The court responded, "Yes, sir, you may do that." The case was argued to the jury and the jury retired to begin its deliberations. While the jury was out counsel for the plaintiffs made the statement, "And may it please Your Honor, may we be permitted to except to the court's ruling in denying the submission of the proposed instructions to the jury." The court then said, "Oh, certainly, gentlemen, you may have an exception to that. You have a right to except to any ruling of the court." The jury returned a verdict for the defendant. Motions for a new trial were overruled and judgments for the defendant were entered.

■ The appellants, plaintiffs in the district court, have twenty-one specifications of error. It is stated that the ver-

dict of the jury is contrary to the over-whelming weight of evidence, that the verdict is contrary to law, and that the court erred in admitting certain evidence over the appellants' objection. The other specifications of error, eighteen in number, relate to the court's instructions to the jury. The appellants do not designate the evidence which they believe was erroneously admitted either in their specifications of error or in their briefs. We shall treat the question as abandoned.

The court instructed the jury that the determinative question in the case arose with respect to the letter of du Pont to Magnolia written in July, 1951, and delivered August 3, 1951; that if the letter did not break the chain of causation the verdict should be for the plaintiffs; and that if it did break the chain of causation the verdict should be for the defendant. These instructions eliminated from the case any question as to whether it had been shown that the tri-processed meal was the cause of the death and disease of the cattle. The issue submitted to the jury was as to whether there was an intervening cause in the conduct of Magnolia which relieved du Pont from such liability as it would otherwise have had.

In 1954 the Supreme Court of Mississippi decided E. I. du Pont de Nemours Company v. Ladner, 221 Miss. 378, 73 So.2d 249. Ladner bought soybean meal from one Thigpen, a retail feed dealer and fed it to his cattle and five of them died. The meal was processed by Magnolia with the use of tri as a solvent and sold by Magnolia to the dealer in the fall of 1951 and delivered to him about November 11th of that year. Ladner sued Magnolia and du Pont. Magnolia made a settlement and the cause was dismissed as to it. Upon a trial the testimony of Ford as to the discussion with Armstrong was the same as in the case here decided, in fact in this case a transcript of Ford's testimony in the Ladner case was, by agreement, used in lieu of a deposition or other testimony by Ford. Ladner recovered a judgment. The Supreme Court of Mississippi reversed and held that the warning letter was clear and du Pont was not liable for the failure of Magnolia to heed the warning. The rule of law applicable was quoted from American Jurisprudence and is thus stated:

"One who acts negligently is not bound necessarily to anticipate that another person will be negligent after the latter has discovered the danger arising from the former's negligence. The first actor, however, is not permitted to assume that the second actor will discover the danger caused by the first actor's negligence. Accordingly, where the second actor after having become aware of the existence of a potential danger created by the negligence of the first actor, acts negligently in respect of the dangerous situation and thereby brings about an accident with injurious consequences to others, the first actor is relieved of liability, because the condition created by him was merely a circumstance and not the proximate cause of the accident." 38 Am.Jur. 731, Negligence, par. 72.

The Mississippi court held as a matter of law, as was found by the jury in the case before us as a matter of fact, that the sales by Magnolia of the tri-processed meal for cattle feed after being warned was an intervening act which broke the chain of causal relationship between du Pont's negligence and the injury to the cattle. The Mississippi court said:

"After R. Stewart Armstrong had delivered Du Pont's warning letter to Ford and Reed on August 3, 1951, Du Pont had a right to believe that Magnolia would confine its sales of tri-extracted soybean meal to outlets other than cattle feed until more definite information was available from the investigations then under way. Du Pont had a right to believe that the warning letter would not be disregarded; and we think that Magnolia's conscious act in refusing to heed the warning and in selling the carload of tri-extracted soybean meal

to Thigpen for cattle feeding purposes after being apprised of the potential danger, constituted an independent, efficient intervening cause, which was not foreseeable by Du Pont, or, in other words, constituted a superseding cause of the injury operating to eliminate Du Pont's responsibility for its original negligence, if there was such negligence in fact." E. I. Du Pont de Nemours & Co. v. Ladner, 73 So.2d 249, 256.

The doctrine as to intervening cause has been set forth in these words:

"The connection between the defendant's negligence and the plaintiff's injury may be broken by an intervening cause. Intervening cause is merely proximate cause flowing from a source not connected with the party sought to be charged. While the term may have some descriptive value, unduly elaborate discussion of intervening cause as such tends to becloud rather than clarify the relatively simple idea of causal connection. When it is determined that a defendant is relieved of liability by reason of intervening cause, it would appear to mean simply that the negligent conduct of someone else—and not that of defendant—is the proximate cause of the event.

"When the natural and continuous sequence of causal connection between the negligent conduct and the injury is interrupted by a new and independent cause, which itself produces the injury, that intervening cause operates to relieve the original wrongdoer of liability. The original negligent conduct, while a cause of the injury, is merely a remote and not a proximate cause thereof." 1 Shearman & Redfield on Negligence, Rev.Ed. 99, § 37.

■ Du Pont acquired knowledge of the dangers of feeding tri-processed soybean meal to cattle and it might be assumed that, prior to the warning letter, Magnolia was without such knowledge or not as aware of the dangers as du Pont was or should have been. Under such circumstances du Pont was under a duty to warn Magnolia of the risks. See 1 Shearman & Redfield on Negligence, Rev.Ed. 64, § 26. Prosser on Torts, 2d Ed. 504. It follows, of course, that when a warning is given the orginal manufacturer or supplier, here du Pont, is not liable. See Ford Motor Company v. Wagoner, 183 Tenn. 392, 192 S.W.2d 840, 852, 164 A.L.R. 364, and the cases cited in the A.L.R. annotation.

■ Unless the verdict is contrary to the great weight of evidence, it will not be disturbed on appeal. Flewellen v. Logan, 5 Cir. 1939, 106 F.2d 151; Travelers Insurance Co. v. Warrick, 5 Cir. 1949, 172 F.2d 516; Good Holding Co. v. Boswell, 5 Cir. 1949, 173 F.2d 395; certiorari denied 338 U.S. 815, 70 S.Ct. 55, 94 L.Ed. 493; Atlantic Coast Line R. Co. v. Mims, 5 Cir. 1952, 199 F.2d 582. This is also the rule in Mississippi. Yazoo & M. V. R. Co. v. Smith, 188 Miss. 856, 196 So. 230. There was ample evidence to sustain the verdict for du Pont on the issue of intervening cause. We need not determine whether, had the verdict and judgment been for the appellants, we would be required to reverse under the rationale of the Ladner case.

■ The appellants requested twenty separate instructions to the jury. They urge error in that they were not given and in the charges of the court as given. Some of the instructions requested, such as those involving violations of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq. and the Hawaii Food, Drug and Cosmetic Act, Rev.Laws Hawaii 1945, § 2201 et seq., had no materiality in view of the instruction that the verdict should be for the appellants unless the chain of causation was broken. The court's charge as given covered all of the matters included in appellants' requested charges which were pertinent to the issues submitted. The only objection of the appellants to the instructions given by the court, made before the jury retired to consider its ver-

dict, was directed to the question of prospective damages. In an oral opinion given by the district judge in overruling the appellants' motion for a new trial the view was expressed that the appellants had been confined to a too narrow gauge of estimate of damages but since the jury found no damages the error, if any, was harmless. We are in accord with this view.

 We think that in all respects the instructions dealing with liability fairly presented the issues. No reversible error appears either in the instructions given or in those refused. See Good Holding Co. v. Boswell, supra; Atlantic Coast Line R. Co. v. Mims, supra.

Since we find no error prejudicial to the appellants the judgment is

Affirmed.