# KAPP v. E. I. DU PONT DE NEMOURS & CO., Inc.

## No. 3476.

District Court, E. D. Michigan, S. D.

Aug. 7, 1944.

Kerr, Lacey & Scroggie and Wilfrid C. Dilworth, all of Detroit, Mich. (Elmer H. Groefsema, of Detroit, Mich., of counsel), for plaintiff.

Butzel, Eaman, Long, Gust & Bills, Rockwell T. Gust, and Addison D. Connor, all of Detroit, Mich. (Carl E. Geuther, of Philadelphia, Pa., of counsel), for defendant.

LEDERLE, District Judge.

This is an action in which plaintiff, Elmer Dennis Kapp, a citizen of Michigan, seeks to recover damages in the amount of $200,000 from the defendant, E. I. Du Pont de Nemours & Co. Inc., a Delaware corporation, arising out of a chemical explosion in which plaintiff's vision was destroyed. Defendant corporation being regarded as a citizen of the state which created it, Sun Printing & Publishing Ass'n v. Edwards, 194 U.S. 377, 24 S.Ct. 696, 48 L.Ed. 1027, this court has jurisdiction of the action as a controversy between citizens of different states involving more than $3,000. 28 U.S.C.A. 41(1). For brevity, said defendant will be hereinafter designated as "Dupont".

The cause of this explosion was the violent release of gas pressure which had formed within a closed 5 gallon glass bottle of aqua ammonia. The product, known in the trade as "28% Aqua Ammonia," was aqua ammonia 29.4% or 26°, a solution of ammonia in water. Ammonia is a colorless gaseous compound of nitrogen and hydrogen, $NH_3$. Aqua ammonia is volatile, alkaline and caustic. In commercial handling of aqua ammonia, there is practically always some slight liberation of ammonia gas out of the solution. The application of heat accelerates the gas release. When confined in a closed container, this process tends to develop gas pressure greater than normal air pressure, making imminent an explosion, the force of which will be in proportion to the degree of gas pressure developed. This propensity renders aqua ammonia dangerous unless stored in a cool place.

To avoid the mild explosions, evidenced by "popping" of stoppers, commonly encountered in normal handling of aqua ammonia, it is customary to control the slight gas pressure which usually develops by leaving a free air space in the container, securely fastening the container's stoppers, and, in opening, to loosen the stopper slowly permitting a gradual and orderly exhaustion of the gas.

At the time of this unfortunate occurrence, plaintiff, who was then a minor, had been in the employ of Detroit Steel Products Company, at Detroit, for some 5 months as a helper operating a blueprint machine. Shortly before, plaintiff's employer had commenced using aqua ammonia in developing blueprints. On the afternoon in question, plaintiff's superior instructed him to get a gallon of aqua ammonia for the blueprint department. Plaintiff went to the stationery stockroom, where he found a 5 gallon wood-crated glass bottle filled with aqua ammonia, to which was glued a 2 by 2½ inch red and white paper label, inscribed as follows:

"Aqua Ammonia 28%
"Poison (skull & cross bones) Caution
"External Antidote: Flood with water, then with vinegar.
"Internal Antidote: Give vinegar or juice of lemon, grapefruit or orange copiously. Follow with olive oil.
"Call physician.
"Eyes: Wash out with 5 per cent boric acid solution.
"Call physician.
"Frank W. Kerr & Company,
"Wholesale Manufacturing Chemists, "Detroit, Michigan."

This bottle had remained where plaintiff's fellow employees placed it upon

receipt 3 days previously, on a metal-topped table adjacent to twelve 1½ inch steam pipes, which supplied heat for the stockroom. The stockroom was normally kept warm to facilitate printing operations carried on there. Neither plaintiff nor any stockroom employee knew anything about the propensities of aqua ammonia. Plaintiff removed the bottle from the table and placed it on the floor. He bent over it, and was in the act of removing strings securing the rubber stopper when the stopper shot out and about half the contents gushed upward. Part of the fluid struck plaintiff's face and eyes. The stopper and upgushing fluid which did not strike plaintiff reached the ceiling, 12 feet above. Plaintiff received first aid at the plant, and was then removed to a hospital, where he underwent treatment for a considerable period of time. Later, he was treated in an eye hospital in Pennsylvania. His condition did not respond to treatment, and the undisputed proof is, that he has suffered permanent loss of vision as a result of this accident.

The case was originally commenced against defendant Dupont and five other defendants, namely,

Frank W. Kerr & Company, a Michigan corporation, from which company plaintiff's employer obtained the 5 gallon bottle of aqua ammonia 3 days before the accident;

• Eaton Clark & Company, a Michigan corporation, from which company the Kerr Company, 10 days before the accident, obtained a 750 pound (110 gallon) drum of aqua ammonia, identified as "Eaton-Clark Company Drum No. 474", out of which the Kerr Company repackaged this 5 gallon bottle;

Three individual citizens of Michigan, who are officers of the Kerr Company.

At the first pre-trial hearing under Rule 16, Rules of Civil Procedure 28 U.S. C.A. following section 723C, this court dismissed the case without prejudice as to all Michigan defendants for lack of jurisdiction because there was no diversity of citizenship between them and plaintiff. See: Kapp v. Frank W. Kerr & Co., D.C., 2 F.R.D. 509. Thereafter, plaintiff instituted a second case in the Wayne County (Michigan) Circuit Court against the defendants here dismissed. Later, plaintiff amended his complaint herein to allege a cause of action against defendant Dupont

as sole defendant. At the opening of the trial in the instant case, plaintiff announced that the state court action against the Kerr Company and its officers had been compromised for $19,000, which amount he intended to credit in mitigation of any recovery against defendant Dupont in this case, in accordance with the provisions of the recent Michigan statute which abrogates the common law rule barring suit against one joint tort feasor after settlement with another, namely, Act 303, Public Acts of Mich. for 1941; M.S.A. 27.1683(1) et seq. The state court case against Eaton Clark & Company is still pending.

At the close of plaintiff's proofs, defendant moved for a directed verdict of no cause of action in accordance with Rule 50, claiming that no liability had been established against it. Counsel suggested a written opinion on this motion for assistance in future proceedings.

Plaintiff's counsel conceded that his claim is predicated solely upon a charge of common law negligence. Plaintiff's main reliance is upon the theory of a negligent act of omission on the part of defendant Dupont, namely, a failure to properly label the drum it delivered to Clark Company, which instigated a chain of circumstances proximately causing the accident.

■ To establish actionable common law negligence in Michigan, plaintiff has the burden of proving each of the following elements thereof: (1) That plaintiff was injured; (2) that plaintiff was free from negligence contributing to his injury; (3) that defendant was negligent; and (4) that defendant's negligence was the proximate cause of plaintiff's injuries. Apparently conceding that plaintiff had introduced evidence sufficient to carry the case to the jury on the first two elements, defendant concentrated its argument on the proposition that plaintiff's proofs fail to establish either of the latter two elements.

■■ As stated in Eaton v. Consumers Power Co., 256 Mich. 549, 552, 240 N.W. 24, 25:

"There is no direct evidence of want of care on the part of the defendant. If negligence is found, it must be on presumption arising from the conditions and circumstances attending the accident. The rule of res ipsa loquitur is not recognized in Michigan; so that the mere fact that

the accident happened is no evidence of negligence. But the plaintiff is not restricted to direct evidence. A want of care may be presumed from established facts and circumstances. * * * In the instant case, the question is whether the record shows facts and circumstances of a nature to raise a presumption that the accident would not have happened save for a want of care on the part of the defendant. Such a presumption would make a prima facie case for the plaintiff."

■ Negligence is defined in Mikulski v. Morgan, 268 Mich. 314, 316, 256 N.W. 339, as, a "want of due care; the failure to exercise that degree of care and caution which an ordinarily prudent person usually exercises under the same or similar circumstances."

The case of Southern R. Co. v. Chatman 124 Ga. 1026, 53 S.E. 692, 697, 6 L.R.A., N.S., 283, 289, 4 Ann.Cas. 675, defines actionable negligence as, "the unintentional failure to perform a duty implied by law, whereby damage naturally and proximately results to another."

■ At the outset, for one to be guilty of actionable negligence, there must be a duty owing to the injured person, which duty has been violated. In other words, paraphrasing, to fit plaintiff's position in the instant case, a statement in Kelly v. Michigan Cent. R. Co., 65 Mich. 186, 190, 31 N.W. 904, 8 Am.St.Rep. 876:

"Negligence in law is a relative term, and implies the non-observance of, or omission to perform, a duty which is prescribed by law, or which arises from the situation of the parties and circumstances surrounding a transaction. There is no provision of law * * * *requiring .a manufacturer to affix a warning label to drums of aqua ammonia which it sells.* If a duty arises, the non-observance of which would be negligence in defendant, to * * * *so label,* it must spring from the situation of the parties and the circumstances of the case."

It is plaintiff's theory that there was no label, warning handlers of the product's propensities and as to proper methods of handling and storing, placed upon the drum at the time it was delivered by defendant Dupont to Clark Company; that, in turn, this absence of proper label caused Clark Company to fail to properly label the drum when it was delivered to Kerr Company; that, in turn, the absence of proper label at the time of delivery to Kerr Company was responsible for Kerr Company's failure to properly label its 5 gallon glass bottle which it filled from the drum at the time plaintiff's employer ordered the product; that, in turn, the lack of a proper label upon the glass bottle was responsible for the failure of plaintiff's employer to store the product away from heat, and, likewise, responsible for . plaintiff's not being warned of the dangerous propensities of aqua ammonia which had been stored near heat; that the storage near heat caused the explosion and plaintiff's injury.

Plaintiff attempted to fit his proof into a second theory, namely, that defendant Dupont sold the product to Kerr Company; that Clark Company acted merely as agent for Dupont in delivering this drum to Kerr Company; that the drum was not properly labelled when so delivered; that this absence of label was the proximate cause of plaintiff's injury, following the chain of causation from Clark Company to plaintiff, as traced in the preceding paragraph; and that for this negligent act of its agent, defendant Dupont was responsible under the doctrine of respondeat superior.

Along this same vein, plaintiff also alleged that, in delivering this aqua ammonia to plaintiff's employer the Kerr Company acted as "distributee" for defendant Dupont, which, plaintiff claims, renders defendant Dupont legally responsible for the acts of Kerr Company.

Eaton Clark & Company have been manufacturing and wholesale chemists for over a century. As far back as the memory of any witness, including its officers, could go, which was over 30 years, this company has been buying, handling and selling aqua ammonia. Its annual volume approximates 300,000 pounds. It is thoroughly familiar with the product, its composition and propensities, and the proper method of packaging, handling and storing the same.

The drum in question bore the following stenciled inscriptions: "Eaton-Clark Co., Aqua Ammonia 26°'" and "Drum No. 474." Clark Company has been purchasing aqua ammonia from defendant Dupont for many years under a purchase contract. The transaction in question originated 45 days before the accident when Clark Company ordered, and received delivery, of thirty 750 pound drums of aqua ammonia from

defendant Dupont. Among these 30 drums was Drum No. 474. As was customary, defendant Dupont picked up 30 of Clark Company's drums, each bearing the stenciled words, "Eaton-Clark Co., Aqua Ammonia 26°" and a drum number. Defendant Dupont filled these 30 drums with aqua ammonia 28%,and returned them to Clark Company. Defendant Dupont invoiced Clark Company for the contract price of the product, and Clark Company paid the same. The transaction was an outright purchase and sale of the contents of 30 drums of aqua ammonia. Clark Company has never acted as agent or defendant Dupont, nor in any capacity other than purchaser of Dupont products.

In all defendant's sales, including servicing of Clark Company drums, it has been customary for many years for defendant to affix to each drum a standard label uniformly used by members of the Manufacturing Chemists Association of the United States, identified as "Exhibit A." This is a white paper label, measuring 4 inches by 6 inches, with a red border and a red arrow, on which the following is printed in prominent red and black letters:

"Aqua Ammonia — Warning

"Transportation Companies:
"Keep Plugs Tightly Closed
"Keep Drum Out of Sun and Away from Heat

"Consignee:
"Keep Body Plug Up and Tightly Closed
"Keep Drum Out of Sun and Away from Heat
"Do Not Use Pressure to Empty This Drum

"Before Removing Plug, Loosen It Slowly to Relieve Pressure—Replace Plug as Soon as Drum is Empty
"Drum Must Not Be Washed Out or Contaminated with Other Materials
"This Drum is Returnable
"M.C.A. of U.S. D-39 Printed in U.S.A."

None of the representatives of defendant Dupont or Clark Company, whom plaintiff called as witnesses, had any knowledge or remembrance that this labeling custom was not followed as to Drum No. 474.

Upon receiving an order from one of its customers for a drum of aqua ammonia, it was customary for Clark Company to check the drum at time of delivery to ascertain if the label was in good condition, and, if it was not, to affix thereto a new label identical to "Exhibit A" described above. None of the representatives of Clark Company, whom plaintiff called as witnesses, had any knowledge or remembrance that Drum No. 474 had been delivered to Kerr Company without following such a labeling routine.

About 2 weeks before the accident, Kerr Company ordered from Clark Company a drum of aqua ammonia. In compliance therewith, Drum No. 474 was delivered to Kerr Company by Clark Company 10 days before the accident. Drum No. 474 and its contents were the property of Clark Company. Clark Company invoiced Kerr Company for the price of the ammonia and a deposit for the drum, in accordance with a purchase contract between Kerr Company and Clark Company. This invoice was paid by Kerr Company to Clark Company. Defendant Dupont had no connection with, nor knowledge of, the transaction, in which Clark Company acted on its own behalf. The transaction constituted a straight sale by Clark Company to Kerr Company, of chemical and drum owned by Clark Company, with the election in the purchaser, Kerr Company, to re-sell the drum to Clark Company for the amount of the deposit. Goebel Brewing Co. v. State Board, 306 Mich. 222, 10 N.W.2d 835.

Inter alia, there was no agency or other relationship between defendant Dupont and Clark Company in connection with this sale by Clark Company to Kerr Company, which disposes of plaintiff's contention that defendant is responsible for acts of Clark Company under the respondeat superior doctrine.

Frank W. Kerr Company is likewise a manufacturing and wholesale chemist, in which business it has engaged for 30 years. During all of such time it has handled aqua ammonia. Its annual volume approximates 20,000 pounds, which it sells under Kerr Company labels to druggists and industrial users exclusively. Some it sells in original drums and some it repackages into smaller containers for its customers. For many years, Kerr Company has been thoroughly familiar with the product, its composition and propensities, and the proper method of packaging, handling and storing the same. On many occasions prior to the accident, Kerr Company had received aqua ammonia in drums bearing labels identical to "Exhibit A," from several manufacturing chemists.

Previously, Kerr Company had purchased drums of aqua ammonia directly from defendant Dupont, which bore labels like "Exhibit A," and Dupont invoices therefor, which Kerr Company received and paid, bore the following printing on the reverse side:

"Caution: Do not place or keep a package containing any product invoiced on the reverse side exposed to the sun, near a stove, steam pipe, radiator, nor in any other place where it can become hot, as heat will cause the product to expand and may rupture the package. Store in a dry place to avoid rusting."

There were 4 of such direct sales by Dupont to Kerr Company within a few months prior to the time in question.

The United States Pharmacopoeia contains a section dealing with aqua ammonia, and warns that it should be stored in a cool place. At and prior to the time in question Kerr Company had numerous copies of this book, which its employees used constantly. Kerr's president knew of this specific section prior to the repackaging in question.

For the past 10 years, the only label which Kerr Company put upon aqua ammonia sold by it was that quoted on page 2 (57 F.Supp. 37) hereof, which did not bear any direction to store in a cool place, warn against storing near heat, nor direct the method of opening. No other label had ever been provided by Kerr Company for its employees to affix to aqua ammonia which it sold, nor had its officers ever directed its employees to give any other warning.

■ Defendant Dupont had no control over, nor knowledge of, Kerr Company's practice in selling aqua ammonia, whether obtained from defendant Dupont or any of Kerr's other sources of supply. In repackaging and selling this 5 gallon bottle of aqua ammonia to plaintiff's employer, Kerr Company acted solely on its own behalf as seller of a product which it owned. Kerr Company did not act for defendant Dupont in this transaction, either as "distributee", agent, or in any other capacity. Consequently, defendant Dupont is not responsible for Kerr Company's acts under the doctrine of respondeat superior.

■ Plaintiff predicates his contention that Drum No. 474 did not bear the proper warning label when delivered by defendant Dupont to Clark Company 45 days before the accident, and, likewise, when Clark Company delivered to Kerr Company 10 days before the accident, and that such failure to label was the proximate cause of the accident, solely upon the testimony of Kerr Company employees that the day following the accident they examined Drum No. 474 in Kerr's warehouse and then found no label on it.

To so infer the alleged act of negligence, failure to properly label, would be clearly unreasonable because of its remoteness, as succinctly expressed in the third syllabus of Hulett v. Great A. & P. Tea Co., 299 Mich. 59, 299 N.W. 807, thus:

"In action for injuries sustained by plaintiff when she fell upon defendant storekeeper's floor between 10 and 11 o'clock in the morning, testimony that there was oil and dirt on the floor about 6 o'clock in the afternoon of the same day was properly rejected as too speculative and remote to indicate the condition of the floor at the time of the accident in absence of proof the floor was in the same condition at the time of the accident."

■ To trace an absence of label back to defendant Dupont on this testimony, it would be necessary to infer that the condition of the drum was the same several days previously when Kerr employees filled the bottle from it, that its condition had remained unchanged for 45 days after it left Dupont's possession, from this inference of unchanged condition to infer that Dupont had failed to label, and from the inference of absence of label to infer that such absence proximately caused intermediate handlers to fail to warn subsequent handlers. This would be raising inference upon inference, a method of proof which is universally condemned. What was said in Standard Drug Store v. A. E. Wood & Co., 227 Mich. 333, 338, 198 N.W. 960, 961, referring to a defense which failed for lack of supporting proof, is equally applicable to the prosecution in the instant case, namely:

"Inability to meet legal requirements of evidence in support of a theory does not brush aside rules and open the way to supposition and inferences without evidentiary support. Presumptions and inferences may be drawn from facts established, but may not rest presumption upon presumption, or inference upon inference. A defense should not only have a theory, but as well

be supported by evidence of probative value. * * * Defendant's theory of the origin of the fire, under the most favorable view of the evidence tendered, never advanced beyond a mere conjecture and did not come within hailing distance of probability."

Plaintiff attempted to elicit proof, by a series of hypothetical questions to Kerr employees, that, if Drum No. 474 had borne a proper label when received by Kerr Company 10 days before the accident, Kerr employees would have used a similar label in repackaging the bottle therefrom 3 days before the accident. However, this attempt failed, and the proof was explicit that previously Kerr Company handled drums of aqua ammonia, received from many suppliers and bearing proper warning labels, and had likewise been warned by the wording of invoices, knew the Pharmacopoeia direction, was throughly familiar with the chemical and its propensities, and, in reselling the product had never used nor intended to use any label other than the one on the bottle in question, which did not warn of the explosive propensities of aqua ammonia.

■■■ However, conceding for argument that Drum No. 474 was not labelled according to Dupont practice, and that Clark Company did not follow its practice of remedying this by affixing a label when it delivered the drum to Kerr Company, upon the undisputed proof here, such an absence could not be said to be the proximate cause in the slightest degree of Kerr Company's failure to properly warn those to whom it sold the repackaged product, in the light of the full and complete knowledge of the propensities of aqua ammonia which Kerr Company already possessed and in the light of Kerr Company's frank admission that it never used nor intended to use a label warning of explosive propensities.

Shearman & Redfield on Negligence, 5th Ed., Sec. 26, states:

"The breach of duty, upon which an action is brought, must be not only the cause, but the proximate cause, of the damage to the plaintiff. * * * The proximate cause of an event must be understood to be that which, in a natural and continuous sequence, unbroken by any new, independent cause, produces that event, and without which that event would not have occurred."

■■■ The problem of proximate cause is not always simple, but, as stated in Throckmorton's Cooley on Torts, page 69:

"A practical working rule for determining the proximate cause of an injury is that the conscious wrongful agency operating last in point of time in producing an injury is solely responsible for it, unless such last agency is itself produced or procured by an earlier wrongful agency, or its action is foreseen by the earlier agency as likely to ensue under the circumstances brought about by such earlier agency."

With all the knowledge of aqua ammonia possessed by Kerr Company, and with all the prior warnings given to Kerr Company by defendant Dupont and other suppliers, Kerr Company's failure to warn plaintiff's employer of the explosive propensities of aqua ammonia could not reasonably be said to have been either produced or procured by the alleged absence of Dupont warning label on this one specific drum, nor could Kerr Company's failure to warn its customer be foreseen by Dupont as likely to ensue from an alleged absence of Dupont warning label on this one specific drum. Plaintiff's proof not only failed to show any causal relation between alleged absence of Dupont warning label and Kerr Company's failure to properly label or any facts from which a jury could reasonably make such an inference, but showed conclusively that there was no such causal relation.

■■■ This is one of those cases so graphically described by Judge Minton in the recent case of Burdon v. Wood, 7 Cir., 142 F.2d 303, 305, as follows:

"Where the material evidence from the lips of unimpeached witnesses is non-conflicting and could lead honest, disinterested, and reasonable men to but one conclusion, there are no factual matters to be resolved which call for the intervention of a jury. Such facts await only a court to announce their effect in law. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Troutman v. Mutual Life Ins. Co., 6 Cir., 125 F.2d 769, 772, 773."

Accordingly, the defendant's motion for a directed verdict of no cause of action is granted.