221 Miss. 378 (1954)
73 So.2d 249
67 Adv. S. 9
E.I. DuPONT DE NEMOURS & CO.
v.
LADNER.
No. 39116.
Supreme Court of Mississippi.
June 14, 1954.
Carl E. Geuther, Walter D. Ford, Wilmington, Delaware; Hall & Callender, Columbia; Wells, Thomas & Wells, Jackson, for appellant.
*384 Morse & Morse, Poplarville, for appellee.
*389 Williams & Williams, Poplarville, Amicus Curiae.
Wynn, Hafter, Lake & Tindall, Greenville, Amicus Curiae.
*390 KYLE, J.
Frank Ladner, as plaintiff, recovered a judgment in the Circuit Court of Pearl River County against E.I. Du Pont de Nemours and Company, defendant, for the sum of $1,793; and from that judgment the defendant prosecutes this appeal.
The declaration was filed by the plaintiff on July 25, 1952, against Magnolia Soy Products Company, a corporation domiciled at Greenville, Mississippi, and E.I. Du Pont de Nemours and Company, a Delaware corporation, as defendants. The plaintiff alleged in his declaration that during the month of December 1951 he purchased from L.J. Thigpen, a retail merchant, engaged in the business of selling cattle feed in the Town of Poplarville, several sacks of soybean meal to be used in feeding the plaintiff's dairy cattle; that he fed the meal to his dairy cattle, and that five of his cows sickened and died as a result of eating the meal. One other cow became sick, and her value as a milch cow was destroyed. The plaintiff alleged that the meal had been processed by the Magnolia Company, which owned and operated a plant at Greenville, and that Magnolia had used in the processing of the meal a chemical compound known as trichloroethylene, a compound manufactured and sold by the defendant Du Pont for use by manufacturers of soybean meal as a solvent in extracting oil from the soybeans. The plaintiff alleged that the processing of soybean meal by the use of trichloroethylene rendered the meal poisonous and unfit for cattle feed; that both Magnolia and Du Pont knew, or by the exercise of reasonable care should have known, that the processing of soybean meal by the use of trichloroethylene as a solvent would make the meal unfit for use as cattle feed; that Du Pont had recommended and sold the chemical to Magnolia as a solvent to be used in the manufacture of soybean meal, knowing that the meal was to be used as food for cattle; that both defendants had breached their duties to the *391 plaintiff and were guilty of negligence which proximately caused the death of the plaintiff's cattle.
Before the case was tried Magnolia effected a settlement of its liability for the sum of $675, and the plaintiff dismissed his suit against Magnolia.
In his declaration the plaintiff alleged that the defendant Du Pont owed to the plaintiff as a purchaser of soybean meal manufactured by Magnolia by the use of trichloroethylene the duty to inform the plaintiff, Magnolia, or the general public of the fact that trichloroethylene, when used as a processing agent for the manufacture of soybean meal, rendered the meal poisonous and unfit for use as food for cattle, and the duty not to introduce said chemical compound and offer the same for sale in interstate commerce for use as a solvent in the manufacture of soybean meal to be fed to cattle.
The defendant Du Pont in its answer admitted that it was engaged in the business of manufacturing and selling trichloroethylene, and that it had sold said product in interstate commerce to Magnolia to be used in extracting soybean oil from soybeans; but the defendant denied the other allegations of the plaintiff's declaration, and averred that the declaration failed to state a claim against the defendant upon which relief could be granted.
Ladner testified that he owned about 40 head of cattle and that he was milking 20 cows at the time that he purchased the soybean meal. After purchasing the soybean meal he fed the cows daily a mixture of soybean meal and crushed corn, wheat shorts and beet pulp. About four weeks after he began feeding the soybean meal to the cattle, the cattle quit eating; their eyes became bloodshot; there was bleeding from the nostrils, some of them passed blood from their udders. Five of the cows died and one other cow was ruined for a dairy cow. Several other witnesses who had purchased soybean meal from L.J. Thigpen about the same time, testified that their cattle had been affected in a similar manner. Dr. Vernon *392 D. Chadwick, Executive Officer of the Livestock Sanitary Board, testified that he was notified of the diseases among the cattle in Pearl River County about December 21st. He made an immediate visit to the county and examined the diseased cattle on several farms. The animals appeared to be affected alike. The symptoms common to all seemed to be a weak and wobbly gait, hemorrhaging of the mucous membrane around the eyes and in the tail region. Some of the animals showed signs of diarrhea with a bloody tinge to the feces. Some of the animals showed two or three degrees of temperature. Dr. Chadwick testified that in his opinion soybean meal which had been processed by the use of trichloroethylene as a solvent, if fed to cattle over a considerable period of time, would eventually cause death; and that in his opinion the feeding of the tri-extracted soybean meal to the cattle which he had examined in Pearl River County caused the death of the cattle.
Dr. Raymond T. Vaughn of the Barrow-Agee Laboratories of Memphis, Tennessee, testified that he had analyzed a sample of the soybean meal which had been sent to him by the law firm of Williams and Williams, of Poplarville, Mississippi, in September 1952, and that he had found that the meal contained a trace of trichloroethylene in a quantity of three parts per million. He stated that he did not know whether that amount of trichloroethylene was poisonous to cattle or not. He had no experience in solvent extractions and he knew nothing about the manufacture of soybean meal. Dr. G. Worthen Agee, a qualified chemist of the Barrow-Agee Laboratories, testified that he was not familiar with the technical phases of extracting soybean meal by the trichloroethylene process; but he knew that trichloroethylene had been used by the soybean industry as a solvent in extracting oil. He had read a good deal of literature on the poisonous effects on cattle of soybean meal extracted by the use of trichloroethylene. He stated that the first *393 reference to the subject in point of time was contained in an article by Sir Stewart Stockman, of the Board of Agriculture and Fisheries, published in 1916. Stockman reported in that article that widespread deaths among cattle had occurred in southern Scotland, and that the deaths were caused by feeding soybean meal produced by trichloroethylene extraction. Agee also stated that there were outbreaks of diseases among cattle in Germany, France and Holland during the early twenties, all of which were traced to the feeding of soybean meal produced by trichloroethylene extraction method. From his study of the subject the witness could say that "soybean meal produced by the process of extracting the beans with trichloroethylene has killed cattle in numerous instances and the meal can be regarded as extremely poisonous." He stated that in his opinion the amount of the residual trichloroethylene in the meal was not important. The important factor is that the meal has been produced by that process. He stated that the tri-processed soybean meal seemed to be poisonous only to ruminants or cud-chewing animals. Swine seemed to thrive on it.
L.L. Ford, who supervised the construction of the Magnolia plant during the fall and winter of 1950-1951, testified that he visited other plants using trichloroethylene as a solvent prior to the construction of the Magnolia plant and made contacts with Du Pont as the producer of the trichloroethylene solvent. He stated that Du Pont's representatives furnished information concerning the use of the solvent in the processing of soybean meal, and advice concerning the erection and equipment of the plant. R. Stewart Armstrong, a solvents technician of Du Pont, visited the plant at frequent intervals as the work was nearing completion. Ford stated that he followed the directions given to him by Du Pont's representative in all matters relating to the erection of the plant and the installation of proper machinery, and that *394 he read all of the literature sent to him by Du Pont on the subject of manufacturing soybean meal by the use of trichloroethylene as an oil extraction solvent. The plant was completed and manufacturing operations were commenced about March 15, 1951. Operations were discontinued sometime during the month of May and were not resumed until October.
The carload of meal which Thigpen purchased from Magnolia was purchased during the fall of 1951 and was received by Thigpen about November 11. Ford stated that the meal was processed from the 1951 soybean crop; and it appears from the record that the trichloroethylene used in processing the meal was a part of a shipment of trichloroethylene received from Du Pont during the month of May. No other shipment of trichloroethylene was made by Du Pont to Magnolia until sometime during the month of November.
In the meantime, Du Pont had become alarmed during the early summer because of the outbreak of a hemorrhagic disease among cattle in Minnesota on farms using only tri-extracted soybean meal; and on July 31, 1951, Du Pont wrote a letter to Magnolia strongly recommending that sales of tri-extracted meal be confined to outlets other than cattle feed until more definite information was available from investigations then under way. The investigations referred to were investigations undertaken by Du Pont and the University of Minnesota. Du Pont contributed several thousand dollars to help finance the study. On July 31, 1951, Du Pont issued its letter of warning to all manufacturers of soybean meal who were using trichloroethylene as a solvent recommending that the sales of tri-extracted meal be confined to outlets other than cattle feed, until more definite information concerning the causes of the disease was available, and in October 1951 the National Soybean Processors' Association issued a notice to the trade recommending that tri-processed meal be so labeled and not be used for cattle feed.
*395 The letter issued by Du Pont to Magnolia, dated July 31, 1951, was addressed to Lyman Reed, Sales Manager of the Magnolia Company, and was delivered to Lyman Reed and L.L. Ford personally by R. Stewart Armstrong on August 3, 1951. The letter was signed by C.B. Shepherd, Manager of the Chlorine Products Division of the Du Pont company, and was as follows:
 "July 31, 1951
 "Mr. Lyman Reed
 Magnolia Soy Products Co.
 Greenville, Mississippi
 Dear Mr. Reed:
In recent months, there have been increasing indications that trichloroethylene-extracted soybean meal may be associated with a hemorrhagic disease in cattle which has been observed in widely-scattered areas. Research programs are now being undertaken by the University of Minnesota and Iowa State College to investigate the nature and causes of the disease and to determine if trichloroethylene-extracted meal is, in fact, a contributory factor.
The cause of the disease is unknown. The evidence that trichloroethylene-extracted meal is associated in any way with the disease is entirely circumstantial, but the most recent reports have all come from farms using this type of meal in their cattle feed. Thus, despite the satisfactory experience with trichloroethylene-extracted meal in the past, we cannot ignore the possibility that this meal under certain conditions, perhaps in combination with one or more other factors, may be associated with the particular hemorrhagic disease observed in Minnesota and other scattered points.
In view of the present uncertainty, we strongly recommend that sales of trichloroethylene-extracted meal be confined to outlets other than cattle feed until more definite information is available from the investigations now under way in Minnesota and Iowa. To the best of *396 our knowledge, the hemorrhagic disease in question is peculiar to cattle only, and all the available evidence and experience indicates that trichloroethylene-extracted meal is entirely satisfactory as a component for feeding hogs and poultry.
 Very truly yours,
 /s/ C.B. Shepherd, Manager
 Chlorine Products Division."
Ford testified that the above mentioned letter was delivered to Lyman Reed in his presence on or about August 2, 1951. Ford stated that he and Reed read the letter immediately and became very much disturbed. He stated that he said to Armstrong: "Ninety per cent of our business is cattle feed and we can't sell a car a year other than for cattle feed," and now you tell us not to sell any more for cattle feed," and Armstrong said, "I didn't say that." Ford stated that he told Armstrong that Magnolia could not operate unless they sold soybean meal for cow feed. He stated that Magnolia ordered another shipment of trichloroethylene later in the year, and the shipment was received during the latter part of November.
R. Stewart Armstrong testified that he delivered letters similar to the above letter to all manufacturers of soybean meal who were using trichloroethylene as a solvent in the processing of the meal. Armstrong stated that there were eight mills that were using trichloroethylene for the extraction of oils from soybeans in 1951. Only one such mill was using trichloroethylene at the time of the trial, and its output was not being sold as cattle feed, but was being used for the feeding of chickens. Armstrong's testimony indicated that Du Pont was acquainted with the article published by Sir Stewart Stockman in 1916, and the problems that had been encountered in Germany, Holland and Belgium during the twenties. Du Pont was also aware of the appearance of the disease in Colorado and Iowa in 1949.
*397 The first point argued by the appellant's attorneys as ground for reversal on this appeal is that the record shows that the plaintiff's damage was not proximately caused by any negligence on the part of the defendant Du Pont and that the defendant cannot be held legally liable for such damage. The appellant says that, if it be conceded that the proof was sufficient to show that Du Pont was negligent in selling trichloroethylene to Magnolia for use in processing soybean meal for cattle feed, and if it be conceded that the sale and shipment in interstate commerce of trichloroethylene for use in processing soybean meal for cattle feed constituted a violation of the Federal Food, Drug and Cosmetic Act, the negligence of Du Pont in selling such chemical compound to Magnolia for use in processing soybean meal for cattle feed was abrogated by the letter written by Du Pont to Magnolia on July 31, 1951, and delivered by R. Stuart Armstrong to Reed and Ford in person approximately three months prior to the shipment of the carload of meal by Magnolia to Thigpen during the latter part of November, 1951. The appellant contends that the act of Magnolia in selling tri-extracted soybean meal for cattle feeding purposes after the receipt of Du Pont's warning letter was an independent intervening act which broke the chain of causation, in that Du Pont's negligence was no longer operative after the delivery of the above mentioned warning letter and the negligence of Magnolia in selling the tri-extracted soybean meal to Thigpen for cattle feeding purposes after receipt of the warning letter was the sole proximate cause of the death of the plaintiff's cattle.
(Hn 1) The general rule relating to the liability of a manufacturer for negligence to remote vendees or other third persons with whom he has had no contractual relations is stated in 65 C.J.S. 619, Negligence, par. 100a, as follows:
"It is a general rule that a manufacturer or seller of an article is not liable to a third person, who has no contractual *398 relation with him, for negligence in the manufacture or sale of the article. This rule has been said to be the early general rule in this country, and has been said to have been abolished or abandoned in some jurisdictions. There are also well-recognized exceptions to the rule, as where the article causing the injury is inherently or imminently dangerous in kind, as discussed infra subdivision b of this section, or where the thing causing the injury is not imminently dangerous in kind, but is rendered dangerous by reason of some defect, infra subdivision c of this section, and it has been said that there has been a general tendency on the part of the courts to broaden the exceptions."
(Hn 2) Poisonous or dangerous drugs, as well as dangerous chemicals, are familiar examples of substances recognized as inherently dangerous within the meaning of the rule stated above. It is generally conceded that unwholesome or contaminated foods or beverages intended for human consumption are imminently dangerous, and an ultimate consumer may bring an action directly against a negligent manufacturer or packer for injuries resulting from the use of such dangerous articles, though there is no contractual relation between the parties. Jackson Coca-Cola Bottling Co. v. Chapman, 106 Miss. 864, 64 So. 791; Pillars v. R.J. Reynolds Tobacco Co., 117 Miss. 490, 78 So. 365; Coca-Cola Bottling Works v. Lyons, 145 Miss. 876, 111 So. 305; Chenault v. Houston Coca-Cola Bottling Co., 151 Miss. 367, 118 So. 177; Bufkin v. Grisham, 157 Miss. 746, 128 So. 563; Coca-Cola Bottling Works v. Simpson, 158 Miss. 390, 130 So. 479, 72 A.L.R. 143; Curtiss Candy Co. v. Johnson, 163 Miss. 426, 141 So. 762; Kroger Grocery Co. v. Lewelling, 165 Miss. 71, 145 So. 726. See Anno. 17 A.L.R. 688; 39 A.L.R. 995; 63 A.L.R. 343; 88 A.L.R. 530; 142 A.L.R. 1491.
The appellee contends that the rule of liability applied in the cases cited above should be applied in cases involving the manufacture of animal foods. The appellant *399 contends, however, that the distinctive rule that has been applied in cases of manufacturers or packers of foods and beverages intended for human consumption is not applicable in cases involving animal foods, where the damages sued for are damages to property and not for personal injuries; and the appellant cites in support of its contention the case of Windram Mfg. Co. v. Boston Blacking Co. (1921), 239 Mass. 123, 131 N.E. 454, 17 A.L.R. 669, wherein the Court said: "No authority has been called to our attention which imposes a common law duty of care toward strangers to the contract, upon the maker of an article which is not inherently dangerous, but is likely to cause a loss to property because of careless preparation." But in so far as the Windram case states and relies upon any "general rule" of nonliability of a manufacturer for negligence, it may be regarded as repudiated by the decision in Carter v. Yardley & Company, Ltd., 319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559; and whether the specific holding of the Windram case would stand under the view now adopted in Massachusetts is open to serious question. See Note 164 A.L.R. 569, 594.
(Hn 3) Whatever the rule may have been originally, the principle seems now to be well established by the decisions of many courts that a person who has had no direct contractual relations with a manufacturer may nevertheless recover from such manufacturer for damages to property caused by the negligence of the manufacturer in the same manner that such a remote vendee or other third person can recover for personal injuries. "The modern doctrine may be regarded as allowing recovery for injury or damage to property in all instances where a case in tort law of negligence can be made out against the manufacturer  that is, where the requisite elements of foreseeability and breach of duty are established, where the manufacturer can be found to have been negligent, and such negligence was the proximate cause of the property damage." Anno. 164 A.L.R. 593. See Ellis v. Lindmark *400 (1929), 177 Minn. 390, 225 N.W. 395; Hunter v. Allied Mills (1937), 184 S.C. 330, 192 S.E. 356; Ebers v. General Chemical Co. (1945), 310 Mich. 261, 17 N.W.2d 176; E.I. Du Pont de Nemours & Co. v. Baridon (1934, C.C.A. 8th Ct.), 73 F.2d 26.
However, it is not necessary for us to undertake to determine at this time whether or not the rule of legal liability applied by our own Court in the cases involving manufacturers of foods and beverages intended for human consumption should be applied in cases involving manufacturers of animal foods. Neither is it necessary for us to undertake to define the exact limits of legal liability of a manufacturer of a chemical compound, which may be harmless or beneficial when properly used for its intended purpose but is likely to cause injury when improperly used, or when used for an improper purpose, who undertakes to direct or recommend the manner in which or the purposes for which such chemical compound shall be used but fails to exercise reasonable care commensurate with the dangers involved in giving such directions and making such recommendations.
(Hn 4) We think that the proof in this case fails to show that Du Pont's negligence was the proximate cause of the injury to the plaintiff's cattle. If Du Pont is to be held liable in a case of this kind, such liability must be predicated upon Du Pont's failure to exercise due care in warning Magnolia of the danger incident to the use of trichloroethylene as a solvent in the processing of soybean meal for cattle feed. But the proof shows that Du Pont did warn Magnolia of the dangers incident to the use of trichloroethylene as a solvent in the manufacture of soybean meal for cattle feed approximately three months prior to the date of the sale of the carload of meal to Thigpen; and even though it may appear that Du Pont should have warned Ford and his associates prior to August 3, 1951, it cannot be said that Du Pont's *401 failure to give such warning at an earlier date was the proximate cause of the death of the plaintiff's cattle.
After a careful examination of the record in this case, we think that the act of Magnolia in selling the trichloroethylene extracted soybean meal for cattle feed after the receipt of the Du Pont warning letter of July 31, 1951, was an intervening act sufficient to break the chain of causal relationship between Du Pont's negligence and the injury to the plaintiff's cattle.
The record shows that trichloroethylene was a solvent used for many purposes. It had many legitimate uses. If Du Pont owed a duty to Magnolia and the plaintiff as a user of Magnolia's products to warn Magnolia of the dangers incident to the use of trichloroethylene as a solvent in the manufacture of soybean meal for cattle feed, Du Pont discharged that duty by writing and delivering to Magnolia the warning letter dated July 31, 1951. The warning letter was specific and its meaning clear; and Du Pont was not liable for Magnolia's failure to heed that warning.
(Hn 5) "One who acts negligently is not bound necessarily to anticipate that another person will be negligent after the latter has discovered the danger arising from the former's negligence. The first actor, however, is not permitted to assume that the second actor will discover the danger caused by the first actor's negligence. Accordingly, where the second actor after having become aware of the existence of a potential danger created by the negligence of the first actor, acts negligently in respect of the dangerous situation and thereby brings about an accident with injurious consequences to others, the first actor is relieved of liability, because the condition created by him was merely a circumstance and not the proximate cause of the accident." 38 Am. Jur. 731, Negligence, par. 72.
(Hn 6) After R. Stewart Armstrong had delivered Du Pont's warning letter to Ford and Reed on August 3, 1951, *402 Du Pont had a right to believe that Magnolia would confine its sale of tri-extracted soybean meal to outlets other than cattle feed until more definite information was available from the investigations then under way. Du Pont had a right to believe that the warning letter would not be disregarded; and we think that Magnolia's conscious act in refusing to heed the warning and in selling the carload of tri-extracted soybean meal to Thigpen for cattle feeding purposes after being apprised of the potential danger, constituted an independent, efficient intervening cause, which was not foreseeable by Du Pont, or, in other words, constituted a superseding cause of the injury operating to eliminate Du Pont's responsibility for its original negligence, if there was such negligence in fact. Wissman v. General Tire Co. of Philadelphia, Inc., 192 Atl. 633, 327 Pa. 215, (Pa. S.Ct. 1937); Kapp v. E.I. Du Pont de Nemours & Co., 57 F. Supp. 32 (1944); Foster v. Ford Motor Co. (1926), 139 Wash. 341, 246 P. 945; Catlin v. Union Oil Co. (1916), 31 Cal. App. 597, 161 P. 29; Harper v. Remington Arms Co., 280 N.Y.S. 862; Ford Motor Co. v. Wagoner, 183 Tenn. 392, 192 S.W.2d 840, 852, 164 A.L.R. 364; Mississippi City Lines, Inc. v. Bullock, et al., 194 Miss. 630, 13 So.2d 34; Stewart v. Kroger Grocery, etc., Co., 198 Miss. 371, 21 So.2d 912.
We do not think that the statements alleged to have been made by R. Stewart Armstrong to Ford and Reed at the time he delivered the warning letter to Ford and Reed detracted from the force of the warning letter. Magnolia did not manufacture soybean meal for Du Pont. Magnolia was an independent manufacturer of soybean products and was in a position to exercise its own judgment in the sale of its products to distributors for resale to ultimate consumers.
(Hn 7) In view of the conclusions that we have reached on the question of proximate cause, it is not necessary for us to consider the question as to whether the Federal Food, *403 Drug and Cosmetic Act was applicable to the sale of trichloroethylene by Du Pont to Magnolia.
"It is not material whether the negligence complained of in an action was the violation of a duty imposed by the common law or the violation of one imposed by a statute or ordinance, so far as concerns the requirement that negligence must have been the proximate cause of the plaintiff's injury to warrant a recovery. * * * If the violation of the statute or ordinance by the defendant was not the direct and proximate cause of the accident, he is not liable for the injury of which complaint is made." 38 Am. Jur. 837, Negligence, par. 166.
For the reasons stated above the judgment of the lower court is reversed and judgment will be entered here in favor of the appellant.
Reversed and judgment rendered for appellant.
All Justices concur, except Hall, J., who took no part.