**Mrs. Ivy L. GORDON,
Plaintiff-Appellee,**

v.

**NIAGARA MACHINE & TOOL
WORKS, Defendant-Appellant.**

**No. 74–2319.**

United States Court of Appeals,
Fifth Circuit.

Jan. 13, 1974.

Allan D. Shackelford, Clarksdale, Miss., for defendant-appellant.

Charles C. Finch, Batesville, Miss., Henry Woods, Little Rock, Ark., D. Briggs Smith, Jr., Batesville, Miss., for plaintiff-appellee.

Before COLEMAN, CLARK and RONEY, Circuit Judges.

COLEMAN, Circuit Judge.

This diversity action for damages for personal injury was brought by Mrs. Ivy Gordon, a Mississippi citizen, against Niagara Machine and Tool Works, a New York Corporation. On February 9, 1969, four fingers were severed from Mrs. Gordon's left hand when the jaws of a power press manufactured by Niagara unexpectedly came together while she was operating the machine. After a Bench trial, there was judgment for the plaintiff on the theory that Niagara had breached its duty to warn Mrs. Gordon of the dangerous nature of the machine and that this omission was a proximate cause of the injury. Damages were assessed in the sum of $73,470.55.

The District Judge specifically declined to decide the case as one of strict liability in tort. He would not apply Section 402(a) of the Restatement. He decided it altogether as "negligent failure to warn", Section 388 of the Restatement of Torts.

We reverse and remand for further proceedings not inconsistent herewith.

### FACTS

The power press, a giant machine standing ten feet high and capable of exerting sixty tons of pressure, was manufactured by Niagara and delivered to Poloron, a New York Corporation on October 12, 1954. Five years later, Poloron shipped the machine to its Batesville, Mississippi plant, where Mrs. Gordon eventually became employed.

The primary function of the machine is simple. The moving upper jaw is de-

signed to come down upon the stationary lower jaw. The upper jaw can be set to operate either continuously or, as was true in this case, upon the manual command of an individual operator.

When the machine was delivered in 1954 the manual command device was a foot treadle, installed by Niagara. Poloron later replaced the foot treadle with a palm button system. This push button system used air pressure to activate the press. The system was supposedly safer than the foot treadle because it had to be operated by the use of both hands, thereby presumably assuring that an operator could not activate the machine while either hand was inside it. This particular press button system, installed by Poloron, was manufactured by Schreder Corporation. Niagara manufactured similar palm button systems, however, and knew that they were used by many press owners.

As delivered to Poloron, the machine's jaws did not themselves close together, one upon the other. The machine became "operational", and thus potentially dangerous to users, only after the installation of dies within the jaws.

Since the machine could be used for many diverse functions, depending upon the type die used, the installation of dies and guards was left to the purchaser.[1]

When it delivered the press to Poloron, Niagara sent along a pamphlet warning, which read as follows:

"Never place your hands under the slides or between the die unless the power is off and the slides blocked up."

Poloron did not pass this warning on to its employees.

Niagara did not place a warning *directly on the machine.* It relied on the notice given Poloron.

From and after 1954 Niagara had no further contact with the press. It had nothing to do with the type of work to which the machine was assigned, nor with the installation of any dies or guards necessitated by the work. For fifteen years Niagara had heard nothing further from the machine, while Poloron used it in New York and Mississippi.

Mrs. Gordon had four months experience in Poloron's Batesville, Mississippi plant. So far as this record shows, Poloron had never given her any warning that the machine might malfunction. She had been running it for two weeks. On the morning of the injury she was using the machine to trim the sides of an ice chest liner. As she removed a piece of cut material from the machine, the upper jaw unexpectedly closed on four fingers. She had not pressed the two palm buttons, which was ordinarily required to make the upper jaw of the press descend upon the lower jaw.

A fair appraisal of the evidence clearly indicates that nobody knew then, or knows now, what caused the machine to malfunction.

1. At Page 580 of the Appendix, the sales manager of Niagara Machine & Tool Works, who had a B.S. degree in mechanical engineering and who had been employed by Niagara since 1952 testified as to the nature of the press when delivered to Poloron.

"As you call it 'naked press,' I call it a press without a die in it. The problem, guarding is a very sacred part of the press industry. And the press builder, when he sells a multi-purpose press, such as an OBI, as we have in this case here, he has no way of knowing how that particular machine—or what tooling is going to go into the machine. In other words, a press of this type can be fed from the front, it can be fed from the back, it can be fed from the left, it can be fed from the right; you can do pointing work, you can do embossing work, you can do trimming work, you can do punching work, you can do forming work and on and on. In other words, the number of jobs that can be performed in this particular press are just unlimited, within the capacity of the machine, of course, 60 tons. Due to the fact that there are so many different kinds of jobs and each job requires a different kind of tooling, there is no one guard that the manufacturer can put on the press that would suffice all the different kinds of operations that may go into that machine. So, consequently, the standard of the industry in 1954, as well as today, was not to provide guarding for a general purpose machine."

The expert witnesses for the plaintiff said that the most likely cause for the malfunction was clutch failure. This opinion, however, was based on the possibility that dirt or other foreign matter could have invaded the clutch. A thorough inspection of the machine immediately after the accident revealed no such intrusion. Thus, the hypotheses of these witnesses are seriously open to the objection that they are without a basis in fact.

Defendant's experts said that the most likely cause of the malfunction was failure of the Poloron installed palm activation device. This testimony was based on certain idiosyncracies noted in the air pressure operation of the device.

### THE LAW

The judgment for the plaintiff was expressly grounded on the Restatement of Torts, Second, Section 388:

"§ 388. Chattel Known to be Dangerous for Intended Use

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

The Mississippi Supreme Court has never expressly approved or adopted this particular portion of the Restatement. There can be little doubt, however, that upon the presentation of an appropriate case it would do so. For example, in State Stove Manufacturing Company v. Hodges, 189 So.2d 113 (Miss., 1966) the Court adopted Section 402(a) of the Restatement. It overruled the previously existing Mississippi case law on the subject.

The District Court found that Niagara knew that its machine was likely to be dangerous when used in a secondary operation for manual feeding; that *whatever* the reason for a repeat action of the press, when on a single-stroke cycle, serious injury would befall an operator whose hands were within the danger zone; and the machine when operated manually and set on single-stroke cycle could not be completely "fail safe" and accident free.

This satisfied the requirements of Section 388 of the Restatement from the beginning through paragraph (a). It cannot be denominated as clearly erroneous because the written warning given Poloron upon delivery of the press would permit a reasonable inference that Niagara knew the nature of its press.

The Court further found that this was a danger which a machine operator like Mrs. Gordon would have no reason to know of or be aware of because of a reliance upon the belief that the machine would stop always after one cycle and could be fed manually. It was not an obvious danger, it was a latent, hidden and unknowable danger to one untrained in the mechanical operation and understanding of this power press.

As to what Mrs. Gordon *did not know* and could not, in the exercise of her own resources, have known, this finding is supported by the record, and, in the event of liability, negates a reduction of the recovery for contributory negligence.

■ The Court further held, however, that this satisfied the second prerequisite of Section 388, that is, of Section 388(b). This sub-section imposes liability only if Niagara had "no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition". In other words, for recovery against Niagara it would have to be

shown by a preponderance of the evidence and inferences reasonably to be drawn therefrom that in 1954 Niagara had *"no reason* to believe that those for whose use the press was supplied would realize its dangerous condition". The District Court made no explicit finding on this point but appears to have considered that this requirement was met by Mrs. Gordon's individual lack of knowledge in 1969, or her inability to learn of it solely by her own resources. This, we think, was not enough to have met the standard prescribed by Section 388(b).

The Comment on Section 388(b) (Page 306) states that the supplier's duty to warn exists "if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved".

There is evidence in the record from which it could be inferred that Niagara had reason to expect that from warnings by the employer the ultimate user of the machine would discover the danger of double tripping. There is no evidence, that we can find, addressed to the point that the manufacturer had no reason for such an expectation. We are of the opinion that there should be a new trial on this issue, in which the parties may fully develop the record and the trial court may make specific findings.

The Court further found that Niagara failed to exercise reasonable care under the circumstances to bring home to press operators, whomever they might be, notice of the dangerous latent condition and to warn them, in clear and positive terms, against the hazards of hands and arms coming in contact with the danger zone of the dies between cycle operations. Although Niagara did give certain warnings to Poloron, its customer, it failed to attach any plate, label or other device giving effective warning on the machine itself that would bring home to any user the great danger in the manual operation.

This finding is not clearly erroneous but it covers a point, Section 388(c),

which cannot be reached until after one has successfully negotiated his way past Section 388(b).

The Court concluded as follows:

"As the trier of facts, I find that due to the hazards and the severe bodily injury likely to result, the ease with which a label or plate could be put on the machine, the fact that it would be no burden whatever, the fact that it would be the only way to bring home to an operator this danger, insofar as Niagara was concerned, all of those facts, in my judgment, would require Niagara, in the exercise of ordinary care, to have such a plate, device or other warning physically attached to this machine."

This conclusion would be eminently correct if the Section 388(b) hurdle had been successfully negotiated and if it were further found that the negligence of Poloron to warn its employees was not the sole proximate cause of Mrs. Gordon's injuries.

## PROXIMATE CAUSE

We now discuss the issue of proximate cause.

Both appellant and appellee have extensively argued the application of two Mississippi cases. Niagara argues that it is exonerated by E. I. Du Pont de Nemours & Company v. Ladner, 221 Miss. 378, 73 So.2d 249 (1954).

Specifically, Niagara says that it had no duty to warn the operators of the press but if such a duty did exist then the negligence of Poloron in failing to warn its employees was an intervening cause of the injury which *absolved* the defendant of any duty which it otherwise might have had.

Du Pont, a chemical compound manufacturer, sold trichloroethylene to a soybean processor, Magnolia Corporation. Learning that the chemical was unsafe, Du Pont warned Magnolia not to sell soybean meal containing it. Magnolia disregarded the warning and sold meal to a retailer who, in turn, sold it to plaintiff, whose cattle died from the

chemical mixed in the feed. The Mississippi Supreme Court held that a failure to warn could be the basis of liability but *further held* that the warning given to the buyer of the chemical was the only warning required. This was so because the independent intervention of the feed manufacturer in mixing the chemical in violation of the warning was the sole proximate cause of the loss. As to this, there was no room for reasonable men to differ; if the forbidden mixing had not occurred the loss could not have happened. Therefore, the conduct of Magnolia was the sole proximate cause of the loss; it could not be attributed to Du Pont. This, we think, enunciates a fundamental principle of proximate cause in negligence cases.

The plaintiff, in turn, relies upon a recent case grounded not on negligence but on strict liability in tort, Ford Motor Company v. Matthews, 291 So.2d 169 (Miss., 1974). Ford Motor Company sold a retailer a tractor. Some months later Ford warned the retailer that the tractor had a defect in the safety switch. When the tractor was sold to a customer the warning was not repeated. After the retailers reacquired the tractor, they resold it, again neglecting to repair the defect or to communicate the warning it had received. Because of the defective switch, the tractor started while in gear, ran over Matthews, dragged a disc over him, and killed him. Recovery was allowed against Ford Motor Company, notwithstanding the fact that Ford had warned its buyer of the defect and the buyer had not repeated the warning.

In this products liability case, the Mississippi Supreme Court held, per Presiding Justice Rodgers, that "defective" means that a product does not meet the reasonable expectations of an ordinary consumer as to its safety. It was further held that one who sells a *defective product, unreasonably dangerous to the user or consumer*, is subject to liability for the harm thereby caused to such user or consumer, if the seller is engaged in the business of selling such product and the product is expected to and does reach the user or consumer without sub-

stantial change in the condition in which it is sold, even if the seller has exercised all possible care in preparation and sale of the product, and even though the user or consumer did not buy the product from or have any contractual relationship with the seller.

The tractor, four years old, had sustained serious damage in a fire prior to the sale, but since the switch had not been damaged in that fire the jury was not precluded from finding, *insofar as the safety switch system was concerned,* that it had reached the buyer in substantially the same condition as when it left the factory.

The Court concluded:

"The question of liability in this case is largely a factual issue, and we hold that there is substantial evidence on which the judge could base his decision holding Ford strictly liable in tort for the injury to the deceased Ernest Matthews." 291 So.2d at page 177.

The jury question here was whether the defective switch system had remained substantially unchanged through the fire. If it had, there was strict liability in tort because it had been defective from the beginning. Both cases were decided in the light of their particular facts. In one there could be no doubt of the proximate cause. In the other a jury question was presented. We see no legal inconsistency in these cases.

We also indicate our familiarity with the proximate cause issue decided by the Supreme Court in State Stove Manufacturing Company v. Hodges, 189 So.2d 113 (Miss., 1966), a products liability case. A plumber failed to follow the manufacturer's instructions for the installation of a water heater, which resulted in the explosion of the heater and damages to the plaintiff's home. The trial court awarded a judgment against the manufacturer. By a divided vote, the Supreme Court reversed, holding as a matter of law that the plumber's failure to follow instructions was the sole proximate cause of the loss.

With the foregoing discussion we now approach the issue of proximate cause in this case. On this subject the District Court held as follows:

"As the trier of fact, the Court holds that the negligence of Niagara in not providing an adequate warning was a continuing one and combined with the negligence of Poloron in its failure to install adequate safety devices and in its failure to itself give warning to this plaintiff, and the possible negligence, if any, on the part of Schrader. That all of these were efficient and effective causes that resulted proximately in the occurrence of this accident suffered by the plaintiff.

"In this case, the negligence of Poloron and of other parties was foreseeable by Niagara at the time of its sale and delivery of this machine. It is fair to charge it with knowledge that there would be haphazard methods employed by industrial customers. Not everything would be done that should be done.

"Now, in that state of the record, I hold that there was no independent intervening cause that destroyed causation between the negligence of Niagara and the occurrence of this accident, and that the rule of intervening efficient cause laid down by the Mississippi Supreme Court in E. I. duPont deNemours and Company v. Ladner, [221 Miss. 378] 73 So.2d 249, is clearly distinguishable, for in that case duPont, having sold this chemical material to Magnolia, later notified them that they did not have enough information for them to use it in the mixture of cattle feed, but notwithstanding that information, Magnolia, the manufacturer of the cattle feed, proceeded to go on and sell the material to plaintiff for cattle feeding purposes. Plaintiff's cattle died. In that case, the State Supreme Court held that Magnolia's conscious act in refusing to heed the warning and in selling the carload of tri-extracted soybean meal to Thigpen for cattle feeding purposes, after being apprised of the potential dangers constituted an independent efficient intervening cause which was not foreseeable by duPont.

"The duPont case is clearly distinguishable from the case at bar, because in this record the failures and derelictions of Poloron and anyone else were matters wholly within the range of contemplation by Niagara, and clearly it could not insulate its obligation through their acts of negligence, whatever they might be, insofar as exonerating Niagara of its basic duty to give, in an unequivocal way, an effective warning to whoever might operate the press machine. In Mississippi, the cases are legion to the effect that where the occurrence of the intervening cause might reasonably have been anticipated, the intervening cause will not interrupt connection between original cause and injury. Ross v. Louisville-Nashville Railroad Company, [178 Miss. 69] 172 So. 752; Brewer v. Town of Lucedale, [189 Miss. 374] 198 So. 42; Oliver Bus Lines v. Skaggs, [174 Miss. 201] 164 So. 9, and other cases. So the defense of independent intervening cause cannot be accepted and is without merit."

Upon the retrial of this case the issue of proximate cause will not be reached if the evidence fails to meet the prescription imposed by Section 388(b). If that requirement is met the trial court should carefully re-examine the proximate cause problem. In the present posture of the case we are unwilling to decide it as a matter of law, but we are equally unwilling to affirm on that point. Since there is, in any event, to be a new trial we need not do either. As a matter of judicial economy, however, we offer a few observations on the subject.

■ In Mississippi it is undoubtedly the law that an employer has the *absolute* duty to furnish its employees with reasonably safe and sufficient appliances with which to work, to warn inexperienced employees of dangers of which they are ignorant, and to enforce rules so as to render dangerous work as safe

as reasonably possible, Holliday v. Fulton Band Mill, Inc., 5 Cir., 1944, 142 F.2d 1006; Dobbins v. Lookout Oil & Refining Company, 133 Miss. 248, 97 So. 546 (1923). Poloron's pecuniary liability for ignoring these requirements is limited by the Workmen's Compensation statutes, but that does not eliminate the duty.

Prior to this highly regrettable injury, Poloron had this press in its exclusive dominion and control for about fifteen years. For several years prior to the injury other presses had, on occasion, malfunctioned in the Poloron plant, resulting in serious personal injuries. Although the point was not very adequately developed from the testimony of those best able to know the facts, the record before us shows that Poloron had never instructed or warned Mrs. Gordon or the other employees. This makes it extremely difficult to say, either as a matter of fact or law, that Poloron's habitual neglect of its nondelegable duty to warn and instruct had not totally swallowed up the original negligence, if any, of Niagara.

Upon the teachings of the Mississippi Supreme Court in *Du Pont, Ford Motor Company,* and *State Stove,* discussed *supra,* there is a strong likelihood that if that Court had this case before it, it would hold that Niagara's duty to warn was entirely superseded by Poloron's total neglect of its mandatory duty. If Poloron had given the required warnings, what more could Niagara's inanimate warning plate have accomplished?

We leave this to the further consideration of the Court in the light of all the facts as developed at the new trial.

█ If there is liability, appellant's assignment of error as to the excessiveness of damages awarded is without merit.

The judgment is reversed, and since this case was tried to the Court without the intervention of a jury the case is remanded for a new trial on the issues indicated.

Reversed and remanded.